603 A.2d 30

DR. ROBERT B. SICA, PLAINTIFF–APPELLANT, v. BOARD OF ADJUSTMENT OF THE TOWNSHIP OF WALL, DEFENDANT–RESPONDENT, AND TOWNSHIP OF WALL, MONMOUTH COUNTY, A MUNICIPAL CORPORATION OF NEW JERSEY; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WALL; AND PLANNING BOARD OF THE TOWNSHIP OF WALL, DEFENDANTS.

Argued November 18, 1991—Decided March 19, 1992.

*Bruce D. Greenberg* argued the cause for appellant (*Greenbaum, Rowe, Smith, Ravin & Davis*, attorneys, *Douglas K. Wolfson* and *Wilentz, Goldman & Spitzer* (*Messrs. Stephen E. Barcan* and *Richard J. Byrnes*, attorneys), of counsel; *Douglas K. Wolfson, Bruce D. Greenberg*, and *Jessica R. Mayer*, on the briefs).

*Thomas J. Hirsch* argued the cause for respondent (*Crawford & Hirsch*, attorneys).

*Kenneth E. Meiser* submitted a brief on behalf of *amicus curiae*, Volunteers of America (*Frizell, Pozycki & Meiser*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

In *Medici v. BPR Co.*, 107 *N.J.* 1, 21, 526 *A.*2d 109 (1987), we held that an applicant seeking a use variance for a commercial purpose must establish by enhanced proof that the variance is not inconsistent with the intent and purpose of the master plan and zoning ordinance. This appeal raises the question whether the enhanced standard also applies to inherently beneficial uses. The Board of Adjustment of the Township of Wall (the Board) denied the applicant, Dr. Robert B. Sica, a use variance for a trauma rehabilitation center. The Law Division reversed the Board's decision and remanded the matter to the Board to

consider the imposition of reasonable restrictions on the center. In reversing the judgment of the Law Division, the Appellate Division held that the enhanced standard applies to inherently beneficial uses. 246 *N.J.Super.* 338, 340, 587 *A.*2d 661 (1991). We granted Dr. Sica's petition for certification. 126 *N.J.* 334, 598 *A.*2d 892 (1991). Contrary to the Appellate Division, we conclude that the enhanced standard does not apply to inherently beneficial uses. Consequently, we reverse that court's judgment and reinstate the judgment of the Law Division directing the grant of the requested variance.

## I

The basic law governing land use variances is codified in *N.J.S.A.* 40:55D–70d, *amended by L.*1991, *c.* 256, which states that a board of adjustment may

[i]n particular cases and for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use, (3) deviation from a specification or standard pursuant to section 54 of P.L.1975, c. 291 (C. 40:55D–67) pertaining solely to a conditional use, (4) an increase in the permitted floor area ratio as defined in section 3.1 of P.L.1975, c. 291 (C. 40:55D–4), (5) an increase in the permitted density as defined in section 3.1 of P.L.1975, c. 291 (C. 40:55D–4), except as applied to the required lot area for a lot or lots for detached one or two dwelling unit buildings, which lot or lots are either an isolated undersized lot or lots resulting from a minor subdivision or (6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure. A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board, or 2/3 of the full authorized membership, in the case of a regional board, pursuant to article 10 of this act.

If an application for development requests one or more variances but not a variance for a purpose enumerated in subsection d. of this section, the decision on the requested variance or variances shall be rendered under subsection c. of this section.

No variance or other relief may be granted under the terms of this section unless such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance. In respect to any airport hazard areas delineated under the "Air Safety and Hazardous Zoning Act of 1983," P.L.1983, c. 260 (C. 6:1–80 et seq.), no variance or other relief may be granted under the terms of this section, permitting the creation or establish-

ment of a nonconforming use which would be prohibited under the standards promulgated pursuant to that act, except upon issuance of a permit by the Commissioner of Transportation. An application under this section may be referred to any appropriate person or agency for its report; provided that such reference shall not extend the period of time within which the zoning board of adjustment shall act. [Footnotes omitted.]

The statute requires proof of both positive and negative criteria. Under the positive criteria, the applicant must establish "special reasons" for the grant of the variance. The negative criteria require proof that the variance "can be granted without substantial detriment to the public good" and that it "will not substantially impair the intent and the purpose of the zone plan and zoning ordinance."

Dr. Sica's proposed use is a forty-bed "head-trauma" residential-rehabilitation center for which he has received a certificate of need from the New Jersey Department of Health. The certificate, the first granted in this state, requires that ten percent of the beds be reserved for indigent or low-income patients. At present, head-trauma patients must go to New York or Pennsylvania for treatment in a residential program.

Dr. Sica, a neurophysiologist, applied in 1987 to the Wall Township Planning Board for subdivision and site plan approval and for a conditional use permit for the center. He sought to subdivide the 5.45–acre tract on which he proposed to build the center from a thirty-two-acre tract that he had purchased in 1986. The lot, which fronts on Belmar Boulevard, is in an R–60 zone. This zone permits farming, single-family dwellings, public parks, and playgrounds, as well as municipal buildings, facilities, and services essential to the township. When Dr. Sica applied for subdivision approval, the R–60 zone permitted a number of conditional uses, including nursing homes and hospitals. In 1987, the Wall Township land use officer wrote Dr. Sica informing him that the proposed center was permitted as a conditional use. On March 7, 1988, the Planning Board approved the subdivision of the lot. The Township Committee then amended the zoning ordinance to exclude from the entire Township hospitals and nursing homes as conditional uses.

Following the enactment of that ordinance, the Planning Board dismissed without prejudice the application for approval of the site plan and the conditional use.

Dr. Sica then applied to the Board for both a use variance and site plan approval. At the hearing, he testified, as did some of his former patients—one a former resident of the Township—and several expert witnesses. His land use expert testified that the variance would be consistent with the zoning ordinance and master plan, pointing out that the proposed lot and building met all the bulk requirements for the R–60 zone. He distinguished the center from hospitals and nursing homes by noting that, among other things, the center would not receive ambulance calls and that nursing care would be limited to twelve minutes per patient per week. Noting that a horse barn on a neighboring property was larger than the proposed center, an architect testified that the building setback and design, as well as the topography, would render the center unobtrusive. The increase in traffic, according to a traffic expert, would be minimal. A real estate expert testified that the center would not cause a diminution in real estate values. All of the expert testimony remained uncontradicted, notwithstanding the presence of the township planner throughout the hearings.

At the conclusion of the hearings, the Board voted 7–0 to reject the application. It acknowledged that the facility met all of the bulk and buffer requirements of the R–60 zone. The Board concluded, however, that the evidence did not satisfy *Medici*'s enhanced standard of proof that the variance could not "be granted without substantial detriment to the public good," and that it would not "substantially impair the intent and the purpose of the zone plan and zoning ordinance." See *N.J.S.A.* 40:55D–70d. Specifically, the Board found in relevant part:

The Board, pursuant to the dictates of the *Medici* case, is obligated to determine whether or not the removal of nursing homes and hospitals from residential zones by the amendment to the zoning ordinance was meant to include a prohibition against the type of use proposed by applicant. As noted in *Medici*, a reconciliation of a non-permitted use with the zoning ordinance becomes increasingly difficult when the governing body has been made aware

of prior applications for the same use variance but has declined to revise the zoning ordinance. In this case, it is not a question of the governing body declining to revise the zoning ordinance, but a question of them taking specific action to amend the zoning ordinance to prohibit a particular use.

The Board has already pointed out the testimony of applicant concerning the differences between the proposed use and a nursing home. The Board finds that there are some differences between the proposed use and what is traditionally termed a nursing home, however, the Board also finds that it was the intent of the governing body to also preclude the type of use which is the subject matter of this application when it amended the zoning ordinances to preclude hospitals and nursing homes. At the time of the amendment to the zoning ordinance, this application was before the Planning Board, and was considered a permitted use under the general heading of nursing homes. Therefore, in light of the fact that the proposed amendment to the zoning ordinance had to be sent to the Planning Board for their recommendation and the Planning Board recommended the adoption of this ordinance, and the fact that the Mayor and one other member of the committee sit on the Planning Board, the Board comes to the inescapable conclusion that the governing body intended to exclude applicant's type of use from residential zones at the time it amended the zoning ordinance.

Based on this finding, the Board cannot reconcile the grant of this variance with the prohibition of this use from the zoning ordinance. The Board further finds that the applicant certainly has not carried its burden of an "enhanced quality of proof" that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance.

The Board never addressed the question whether "special reasons" existed for approving the proposed head-trauma center. *N.J.S.A.* 40:55D–70d.

The Law Division reversed, finding that the center was an inherently beneficial use and that it satisfied all the criteria for a use variance. On the assumption that *Medici* applied to such uses, the court found the evidence satisfied the requirement for enhanced proof.

In reversing, the Appellate Division assumed that the proposed use was inherently beneficial. 246 *N.J.Super.* at 342, 587 *A.*2d 661. The court found, however, that measured against *Medici*'s enhanced standard, Dr. Sica had failed to demonstrate that the proposed use was not inconsistent with the zoning ordinance and master plan.

## II

■ We begin with the question left unanswered by the Board, whether the proposed use is inherently beneficial. When answering that question, courts generally distinguish between commercial and non-commercial uses. William M. Cox, *New Jersey Zoning and Land Use Administration* § 8–3 (1991). Although inherently beneficial uses are generally non-commercial, various profit-making ventures have been deemed to be inherently beneficial. Examples of inherently beneficial commercial uses include private, for-profit senior citizen congregate-care facilities, *Kunzler v. Hoffman,* 48 *N.J.* 277, 288, 225 *A.*2d 321 (1966); *Jayber, Inc. v. Township of W. Orange,* 238 *N.J.Super.* 165, 174–75, 569 *A.*2d 304 (App.Div.1990); a 120–bed nursing home, *Urban Farms, Inc. v. Borough of Franklin Lakes,* 179 *N.J.Super.* 203, 212, 431 *A.*2d 163 (App.Div.), *certif. denied,* 87 *N.J.* 428, 434 *A.*2d 1099 (1981); a private day-care nursery, *Three L Corp. v. Newark Board of Adjustment,* 118 *N.J.Super.* 453, 457, 288 *A.*2d 312 (Law Div.1972); and a tertiary sewage treatment plant to serve a commercial trailer park, *Wickatunk Village, Inc. v. Township of Marlboro,* 118 *N.J.Super.* 445, 452, 288 *A.*2d 308 (Ch.Div.1972).

■ We have no difficulty in concluding that the proposed head-trauma center is inherently beneficial and that it satisfies the positive criteria of *N.J.S.A.* 40:55D–70d. The center will serve to rehabilitate people who have suffered head injuries and help them to resume lives as useful members of society. According to the New Jersey Department of Transportation, residents of New Jersey sustain approximately 5,000 head injuries per year. Dr. Sica estimates that 500 to 2,000 of those injuries occur in Monmouth and Ocean Counties. The certificate of need granted by the New Jersey Department of Health attests to the need for the center as do the letters of support from local hospitals and the University of Medicine and Dentistry of New Jersey. Significantly, ten per cent of the beds in the center are reserved for indigent patients. So benevolent a facility, even when operated for a profit, easily qualifies as one that is

"inherently beneficial." *See Urban Farms, Inc., supra,* 179 *N.J.Super.* at 212, 431 *A.*2d 163 ("a nursing home, whether or not nonprofit, comes within the inherently beneficial category, particularly where, as here, a certificate of need has been granted and more than a third of its beds have been committed to Medicaid recipients, *i.e.,* indigents"). The proposed center, as one that would serve the general welfare, satisfies the positive criteria. *DeSimone v. Greater Englewood Housing Corp.,* 56 *N.J.* 428, 440, 267 *A.*2d 31 (1970); *Kohl v. Mayor of Fair Lawn,* 50 *N.J.* 268, 279, 234 *A.*2d 385 (1967). In effect, by its nature, the proposed facility creates special reasons for its grant.

For inherently beneficial uses, we have never required either that the site be particularly suitable, *Kohl, supra,* 50 *N.J.* at 279, 234 *A.*2d 385, or that it may not be used for a permitted use, *DeSimone, supra,* 56 *N.J.* at 440, 267 *A.*2d 31; *Kunzler, supra,* 48 *N.J.* at 286, 225 *A.*2d 321. We have yet to determine, however, whether the negative criteria compel consideration of the effect of the proposed use on surrounding property. See *Medici, supra,* 107 *N.J.* at 22 n. 12, 526 *A.*2d 109; Cox, *supra,* at 146.

### III

■ Hence we turn to the initial question, whether *Medici* requires proof of satisfaction of the negative criteria by an enhanced standard when the proposed use is inherently beneficial. *Medici* does not impose any such requirement. The opinion begins: "This case invites our reconsideration, for the first time since *Kohl v. Mayor of Fair Lawn,* 50 *N.J.* 268, 234 *A.*2d 385 (1967), of the factors that should guide a municipal board of adjustment considering a use-variance application for a commercial use that does not 'inherently serve[ ] the public good.' " *Medici, supra,* 107 *N.J.* at 3, 526 *A.*2d 109 (quoting *Kohl, supra,* 50 *N.J.* at 279, 234 *A.*2d 385). By its terms,

therefore, the opinion does not apply to inherently beneficial uses. The Appellate Division was apparently misled by a later sentence in the opinion to the effect that proof by the enhanced standard of satisfaction of the negative criteria "will apply in all use-variance cases." 107 *N.J.* at 4–5, 526 *A.*2d 109. That sentence, however, appears in the middle of a paragraph that begins by repeating the scope of the opinion as delineated in the paragraph's opening sentence that when a variance "is not one that inherently serves the public good, the applicant must prove and the board must specifically find that the use promotes the general welfare because the proposed site is particularly suitable for the proposed use." *Id.* at 4, 526 *A.*2d 109 (footnote omitted). Taken out of context, the statement that the enhanced standard "will apply in all use-variance cases" might be viewed as creating an ambiguity. Taken in context, however, that the enhanced standard does not apply to inherently beneficial uses is apparent.

*Medici*'s facts corroborate that conclusion. Although the zoning ordinance there did not permit hotels or motels, the Board of Adjustment had previously approved three use variances for such uses. When confronted with the grant of a fourth variance, this Court found that the applicant had not met "the formidable burden of proving that the grant of another use variance for a motel at this site was not inconsistent with the intent and purpose of the zoning ordinance as reflected by the governing body's failure to authorize motels as a permitted use in the zone." 107 *N.J.* at 25–26, 526 *A.*2d 109. To prevent conflict between the Board of Adjustment's power to grant use variances under the 1985 amendments and the governing body's power to zone, we mandated "an enhanced quality of proof and clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." *Id.* at 21, 526 *A.*2d 109. The case emphasized that under the 1985 amendments to the Municipal Land Use Law, *N.J.S.A.* 40:55D–1 to –129, rezoning of a municipality should be accomplished not by a board

of adjustment through the liberal grant of use variances for commercial purposes, but by the governing body through amendment to the zoning ordinance. *Medici, supra,* 107 *N.J.* at 5, 526 *A.*2d 109. In the interest of completeness, we note that both the Appellate Division, *Jayber, Inc., supra,* 238 *N.J.Super.* 165, 569 *A.*2d 304, and the Law Division, *Homes of Hope, Inc. v. Board of Adjustment of Mount Holly,* 236 *N.J.Super.* 584, 566 *A.*2d 575 (1989), have also concluded that *Medici's* enhanced standard does not apply to inherently beneficial uses. The Board erred in applying that standard to the subject application.

## IV

The final issue is to what extent a use variance involving an inherently beneficial use must satisfy the negative criteria. As Justice Hall wrote, "[j]ust because an institution is thought to be a good thing for the community is no reason to exempt it completely from restrictions designed to alleviate any baneful physical impact it may nonetheless exert in the interest of another aspect of the public good equally worthy of protection." *Roman Catholic Diocese of Newark v. Borough of Ho-Ho-Kus,* 47 *N.J.* 211, 221, 220 *A.*2d 97 (1966) (*Ho-Ho-Kus* II) (concurring opinion) (footnotes omitted).

Reasonable restrictions may be a more temperate response than a complete rejection of needed regional facilities. Justice Hall concisely described the dilemma posed by an unrestricted ban on such facilities:

> Regional or, for that matter, local institutions generally recognized as serving the public welfare are too important to be prevented from locating on available, appropriate sites, subject to reasonable qualifications and safeguards, by the imposition of exclusionary or unnecessarily onerous municipal legislation enacted for the sake of preserving the established or proposed character of a community or some portion of it * * * or to further some other equally indefensible parochial interest. And, of course, if one municipality can so act, all can, with the result that needed and desirable institutions end up with no suitable place to locate. [*Id.* at 223, 220 *A.*2d 97.]

A too-strict reading of the negative criteria can result in the denial of many deserving inherently beneficial uses, which "should have the right to locate on any appropriate site where the physical impact of their operations can be alleviated to a reasonable extent by the imposition of suitable conditions and restrictions." *Id.* at 222, 220 *A.*2d 97.

The dispositive issue is not whether inherently beneficial uses should be subject to the negative criteria, but whether a board of adjustment or planning board should balance the positive and negative criteria in determining whether to grant a variance. *See Baptist Home of S. Jersey v. Borough of Riverton,* 201 *N.J.Super.* 226, 240, 492 *A.*2d 1100 (Law Div.1984). For commercial uses, *Medici* affirmed that "[t]he board of adjustment must evaluate the impact of the proposed use variance upon the adjacent properties and determine whether or not it will cause such damage to the character of the neighborhood as to constitute 'substantial detriment to the public good.'" 107 *N.J.* at 22 n. 12, 526 *A.*2d 109 (footnote omitted). In making that statement, the Court in *Medici* drew on *Yahnel v. Board of Adjustment of Jamesburg,* 79 *N.J.Super.* 509, 519, 192 *A.*2d 177 (1963), in which the Appellate Division proposed a balancing test: "a discretionary weighing function by the board wherein the zoning benefits from the variance are balanced against the zoning harms." *Yahnel,* like *Medici,* arose in the context of a challenge to the board of adjustment's grant of a use variance for a commercial purpose. Concerning such uses, the standard is to weigh benefits from the grant of the variance against the detriment to the public good. "If on adequate proofs, the board without arbitrariness concludes that the harms, if any, are not substantial, and impliedly determines that the benefits preponderate, the variance stands." *Yahnel, supra,* 79 *N.J.Super.* at 519, 192 *A.*2d 177. Although the issue before us arises in a case concerning the denial of an inherently beneficial use, we must nevertheless consider the relationship between the benefits and burdens of the grant of the variance. As the Law Division recently noted, "[t]he riddle presented by

the inherently beneficial use variance has not been solved." *Homes of Hope, supra,* 236 *N.J.Super.* at 593, 566 *A.*2d 575.

The lower courts disagree on the solution to the riddle. One part of the Appellate Division has repudiated any balancing of the negative and positive criteria:

> *N.J.S.A.* 40:55D–70, by its plain language, requires an applicant for a use variance to establish special reasons *and* to establish the negative criteria.... The concepts of special reasons and negative criteria are independent and separate requirements of proof not to be integrated into some kind of balancing test. [*Lazovitz v. Board of Adjustment,* 213 *N.J.Super.* 376, 382–83, 517 *A.*2d 486 (1986) (citations omitted).]

The Law Division has concluded, however, that a balancing test is appropriate. *Homes of Hope, supra,* 236 *N.J.Super.* at 594, 566 *A.*2d 575. Another part of the Appellate Division disavowed a direct balancing of positive and negative criteria, but recognized the need for some "overall consideration of the proposal * * *." *Medical Realty Assocs. v. Board of Adjustment,* 228 *N.J.Super.* 226, 232, 549 *A.*2d 469 (1988).

Some balancing of benefits and burdens necessarily occurs when one considers whether a use variance will have a substantial detrimental effect on the public good and the zone plan. Without any balancing, a local board's finding that an applicant has not satisfied the negative criteria would always defeat an inherently beneficial use, no matter how compelling the need for that use. *Baptist Home, supra,* 201 *N.J.Super.* at 245, 492 *A.*2d 1100.

Although *N.J.S.A.* 40:55D–70d does not expressly require a balancing of the positive and negative criteria, the need for balancing is implicit in the statutory requirement that the grant of a variance must be "without substantial detriment to the public good." See *Medici, supra,* 107 *N.J.* at 22 n. 12, 526 *A.*2d 109. Under the legislative scheme, not every detriment will support the denial of a use variance. Only one that is "substantial" will suffice. *Id.* at 22–23 n. 12, 526 *A.*2d 109. Fairly read, the requirement that a detriment be substantial necessitates a balancing of positive and negative criteria. *Ibid.; Yahnel, supra,* 79 *N.J.Super.* at 519, 192 *A.*2d 177.

The facts of each case will demonstrate the extent to which an inherently beneficial use compensates for its adverse effect on the neighborhood. Any non-residential use is bound to produce some adverse effect. *Yahnel, supra,* 79 *N.J.Super.* at 519, 192 *A.*2d 177. When the impact of that effect is significant, the balance may tip toward denial. *Baptist Home, supra,* 201 *N.J.Super.* at 247, 492 *A.*2d 1100. Because of an inherently beneficial use's satisfaction of positive criteria, a minimal effect, however, would support a finding that the detriment is not substantial.

We suggest the following procedure as a general guide to municipal boards when balancing the positive and negative criteria. First, the board should identify the public interest at stake. Some uses are more compelling than others. For example, community residences for the developmentally disabled, *N.J.S.A.* 40:55D–66.1; community shelters for victims of domestic violence, *ibid;* and child care centers, *N.J.S.A.* 40:55D–66.6, are so beneficial that the Legislature has permitted them in every residential zone in the state. The Legislature has deemed others, such as family day-care centers, as "home occupations" that may not be subject to more stringent restrictions than other such occupations in the residential zone in which the home is located. *N.J.S.A.* 40:55D–66.4. Thus, the Legislature has removed some uses from the power of local land use boards to preclude them from residential zones. Courts have recognized other uses as sufficiently beneficial to satisfy the positive criteria: low- and moderate-income housing, *DeSimone, supra,* 56 *N.J.* at 442, 267 *A.*2d 31; housing for the poor and homeless, *Homes of Hope, supra,* 236 *N.J.Super.* at 588, 566 *A.*2d 575; senior citizen congregate housing, *Jayber, supra,* 238 *N.J.Super.* at 177, 569 *A.*2d 304; a health-care facility for the elderly, *Baptist Home, supra,* 201 *N.J.Super.* at 240, 492 *A.*2d 1100; a commercial radio transmission tower, *Alpine Tower Co. v. Mayor of Alpine,* 231 *N.J.Super.* 239, 555 *A.*2d 657 (App.Div.1989); and a dial telephone service center, *Yahnel, supra,* 79 *N.J.Super.* at 518, 192 *A.*2d 177. Although

that list may be incomplete, it suffices to identify the kind of use that may outweigh the negative criteria.

■ Second, the Board should identify the detrimental effect that will ensue from the grant of the variance. Certain effects, such as an increase in traffic, *Baptist Home, supra,* 201 *N.J.Super.* at 246, 492 *A.*2d 1100, or "some tendency to impair residential character, utility or value," *Yahnel, supra,* 79 *N.J.Super.* at 519, 192 *A.*2d 177, will usually attend any non-residential use in a residential zone. When minimal, such an effect need not outweigh an inherently beneficial use that satisfies the positive criteria.

Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. *Ho–Ho–Kus* II, *supra,* 47 *N.J.* at 224, 220 *A.*2d 97 (Hall, J., concurring); *Baptist Home, supra,* 201 *N.J.Super.* at 247, 492 *A.*2d 1100. If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions. *Baptist Home, supra,* 201 *N.J.Super.* at 246–47, 492 *A.*2d 1100.

Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good. This balancing, "[w]hile properly making it more difficult for municipalities to exclude inherently beneficial uses * * * permits such exclusion when the negative impact of the use is significant. It also preserves the right of the municipality to impose appropriate conditions upon such uses." *Id.* at 247, 492 *A.*2d 1100.

## V

■ Review of the decision of a board of adjustment denying such a variance because of the failure to satisfy the negative criteria, like the review of decisions of local land use agencies generally, begins with the recognition that the board's decision is presumptively valid, and is reversible only if arbitrary, capri-

cious, and unreasonable. *See Rowatti v. Gonchar*, 101 *N.J.* 46, 51–52, 500 *A.*2d 381 (1985); *Kramer v. Board of Adjustment*, 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965); *Ward v. Scott*, 16 *N.J.* 16, 23, 105 *A.*2d 851 (1954). Underlying the presumption is the recognition that such boards possess special knowledge of local conditions and must be accorded wide latitude in the exercise of their discretion. *Kramer, supra*, 45 *N.J.* at 296–97, 212 *A.*2d 153.

■ With those principles in mind, we turn to the record. Our review of the record leads us to conclude that the head-trauma residential-rehabilitation center will meet a legitimate public need. New Jersey residents who suffer traumatic head injuries should not have to leave this state for residential-rehabilitation treatment. Furthermore, the use is suitable for the site, and the variance may be granted without violating the negative criteria. Nothing supports a contrary decision. The proposed center meets the requirements for the R–60 zone. The building setback and design will render the building unobtrusive. Uncontradicted testimony established the absence of traffic problems and of any diminution in the values of neighboring properties. It is not amiss, moreover, to note that the proposed use was authorized by the ordinance when Dr. Sica purchased the property. *Ho–Ho–Kus* II, *supra*, 47 *N.J.* at 217, 220 *A.*2d 97. We conclude that Dr. Sica is entitled to the grant of the variance, subject to the imposition of reasonable conditions necessary to ameliorate the adverse impact of the negative criteria. *See id.* at 222, 220 *A.*2d 97 (Hall, J., concurring). Ordinarily, we would remand the matter to the Board for reconsideration in light of our decision. Here, however, we are satisfied that the Board's power to impose reasonable conditions suffices to control any adverse impact of the center.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division is reinstated.

*For reversal and reinstatement*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN— 6.

Chief Justice WILENTZ, not participating.