644 A.2d 1115

EAGLE GROUP OF PRINCETON, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. THE ZONING BOARD OF ADJUSTMENT OF HAMILTON TOWNSHIP, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 6, 1994—Decided July 6, 1994.

552

554

Before Judges R.S. COHEN and D'ANNUNZIO.

*Arnold C. Lakind* argued the cause for appellant (*Szaferman, Lakind, Blumstein, Watter & Blader* attorneys; *Mr. Lakind,* on the brief).

*Leo Zamparelli* argued the cause for respondent (*Mr. Zamparelli,* on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

Plaintiff appeals from a Law Division judgment affirming the denial of plaintiff's use variance application by the Hamilton

Township Zoning Board of Adjustment (the board).[1]

Plaintiff's unimproved lot of 52,000 square feet is located in an R–10 zone at the northwest corner of Sloan Avenue and Quakerbridge Road in Hamilton Township.

In addition to single family residential dwellings on lots of at least 10,000 square feet, other principal uses permitted in an R–10 zone include: public playgrounds, public libraries, and buildings used exclusively by the federal, state or municipal government. The following uses also may be permitted as conditional uses: golf courses, hospitals, nursing homes, churches and other places of worship, public schools, conversion of single-family dwellings into offices, and child-care centers and day nurseries.

The Sloan Avenue/Quakerbridge Road intersection is a "major intersection" with traffic signals and "four lanes on each of the legs." Although plaintiff's property on the northwest corner is zoned residential, the other three corners of the intersection are designated highway commercial (HC) zones, and are intended to serve as locations for "highway oriented businesses." These include, for example, restaurants, nightclubs, department stores, bowling alleys, supermarkets, auto repair shops, and business colleges. The southwest corner of the intersection contains a Burger King and a 100,000 square foot shopping center; the southeast corner contains a liquor store and another series of

---

[1] The board adopted its memorializing resolution on September 13, 1989. The Law Division judgment is dated April 5, 1990. Plaintiff filed a Notice of Appeal on May 17, 1990. Shortly before the date set for oral argument, the parties represented to this court that plaintiff was pursuing a transaction that may moot the appeal, and that continued prosecution of the appeal at that time would be inappropriate. Accordingly, this court, with the consent of all parties, granted "plaintiff's oral application for dismissal of this appeal without prejudice to plaintiff's application to reinstate it should future events make that course necessary." *Eagle Group of Princeton v. Zoning Bd. of Adj. of Hamilton Tp.*, No. A–4842–89 (App.Div. March 25, 1991). By order dated November 18, 1993, this court granted plaintiff's motion to vacate the dismissal and to reinstate the appeal.

commercial stores; and on the northeast corner is an Exxon service station and a 27,000 square foot shopping center.

Plaintiff applied for a use variance to construct an 8,000 square foot one-story building on the property, to be used for "retail purposes." Plaintiff sought to develop the property in conformance with the township's neighborhood commercial (NC) zone or community commercial (CC) zone, and presented a "conceptual" site plan to the board. Plaintiff's attorney explained that "[i]f the use variance is granted, then we'll [ ] perfect a site plan that will meet your comments close as possible to meeting the requirements of your neighborhood commercial zone...." The "conceptual plan" showed eight stores occupying the proposed building and provided for fifty-four parking spaces. While it is not clear what the specific stores would be, plaintiff's attorney stated they would consist of any of the uses permitted in the NC zone, with the exception of a WaWa/7–Eleven type convenience store.

Under the township's zoning ordinance, the purpose of the NC zone is to establish

a business district adjacent to residence districts in which such uses are permitted as are normally required for the daily local business and/or convenience needs of the residents of the immediately surrounding residential areas.

Permitted uses include grocery, hardware, candy, stationery and drug stores; laundromats; tailoring, shoe repair and barber shops; and luncheonettes, bakeries and delicatessens, etc.

The CC district is intended to

serve a larger residential population. As such, the areas are almost entirely developed and are located to take advantage of relatively good accessibility from the developed concentrations within the township.

In addition to those uses permitted in the NC zone, the CC district allows restaurants and bars, banks, stereo and TV stores, offices (business and professional), and funeral homes.

Both the NC and CC zones require a minimum buffer of 10 feet along any common property line with a residential district. The HC zone requires a 50 foot buffer when bordering a residential district. NC and CC uses are permitted in HC zones. However,

when that is the case, the use must also comply with the requirements of the HC zone.

Plaintiff called three witnesses at the August 8, 1989 hearing. Ron Curini, a real estate appraiser, opined that, in light of the three other corners of the intersection, the residential zoning of plaintiff's property was an "improper zoning." He stated, "it is almost common sense that no one is going to build houses on that particular property." Curini further expressed his beliefs that the "residential use has in effect ... diminished the value of the property tremendously [ ] as compared to the rest of the neighborhood," and that the property "border[s] on [economic] inutility." He testified that the "variances should be granted" because the proposed use was "compatible with the uses within the area ... [and would] not have any negative effect upon the area." Curini's testimony "assumed" that "there would be a tremendous amount of buffering" separating plaintiff's proposed use from the residential zone.

When asked about the possibility of having a "less intense" use of the property, such as an office or professional use, Curini stated:

Offices and professional uses ... as opposed to commercial [retail] uses, generate more traffic at peak hours ... th[a]n a commercial use.... Number two, let's look at the market for office buildings. And, again, we don't live in a vacuum, you pick up a newspaper, we've got a twenty (20) percent vacancy factor on Route 1, we have a two story office building on Whitehorse Hamilton Square Road opposite from Hamilton Hospital which has been vacant, and continues to be vacant. We've got office building on Quakerbridge Road which are vacant, ... and we've got the State of New Jersey saying in effect that some of the occupants, the State occupants along Quakerbridge Road, they are thinking of moving them into downtown Trenton. So ... when you talk about market, and we talk about peak hour traffic, I think [an office building] would be a worse scenario than what is proposed. [Sic].

Frank Miskovich, a traffic engineer, also testified on plaintiff's behalf. Miskovich conducted a study of the traffic conditions at the intersection. During morning and evening rush hours, the intersection operated at a "service F" level—which he explained has "extreme delays" and is the "worse [sic] case that we could

measure." Saturday peak activity was "somewhat better," operating at a "service D" level.

Utilizing data compiled by the "Institute of Transportation Engineers," Miskovich determined that an 8,000 square foot retail building would generate a .5% to 2.9% increase in traffic at the intersection. He characterized this as "a minimal amount of traffic being added to that intersection." He opined that plaintiff's proposed use would not materially affect or in any way change existing traffic conditions.

Plaintiff's final witness was its planner, Lloyd Jacobs. He stated that the "proposed use is very much compatible with the existing commercial retail uses in the area that exist at the present time." Jacobs characterized the proposed use as "less intense" than the uses on the other three corners of the intersection. He also pointed out that, with respect to traffic conditions, peak hours for retail use are not the same as peak rush hour traffic, i.e., there is very little use of retail centers between 7:45 a.m. and 8:45 a.m.

Jacobs further opined: "To consider residential uses for this property ... would be inappropriate on a corner of a major intersection whereby each of the other quadrants exists with intense highway-commercial uses." Moreover, the proposed use "would not substantially impair the intent and purposes of the Zoning Ordinance, or Master Plan, and would not have a substantial detrimental impact on the public good."

Finally, Jacobs asserted that, assuming the use variance was granted, the subsequent site plan would likely meet all the requirements of the NC and CC zones. He stated that the application of the HC zone to this site would be inappropriate "since we are looking at a neighborhood commercial use."

The application was opposed by many neighboring residents, several of whom were represented at the hearing by counsel.

The resolution memorializing the denial was adopted on September 13, 1989. It contained the following findings of fact:

6. The site abuts a large *residential* development.

7. While there are commercial developments on the southwest and southeast corners of Quakerbridge Road and Sloan Avenue, these commercial uses are on large lots with large setbacks.

8. Based on the following factual findings, this Board concludes that rear yard setbacks cannot be met, buffer areas of substantial width cannot be provided and the proposed site is unsuitable for the proposed use.

a) The size and width of the lots in question, as well as the fact that the site is adjacent to numerous single family houses does not lend itself to retail development.

b) The proposed building does not meet the rear yard setback for the R10 zone in which it is located (the R10 zone requires 35 feet; 10 feet is provided).

c) . . . In this instance, if the site were zoned highway commercial, as the other three corners of this intersection are, a 50 foot buffer would be necessary. This buffer cannot be met.

d) [T]he Board finds that the applicant's proposal would exacerbate an already burdensome traffic problem.

e) In addition to the traffic created at the immediate intersection, many of the adjoining residents testified that a great deal of vehicular traffic cuts through the residential neighborhoods in order to avoid the congestion at the intersection. The Board finds that the applicant's proposal would also exacerbate this situation.

f) [T]he proposed addition of this retail use on the site would have substantial detrimental effects on the neighboring residential properties and the traffic circulation system on and off the site.

. . . .

i) The applicant's witnesses agreed that the site could be developed for a less intense use than that being proposed by the applicant, and the Board finds that an office use would be more acceptable than the applicant's proposal.

. . . .

k) [T]he applicant did not offer any special reasons for the granting of the proposed use variance.

The resolution then addressed the negative criteria. It recognized that *Medici v. BPR Co.*, 107 *N.J.* 1, 21, 526 *A.*2d 109 (1987), required "an enhanced quality of proof and clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." The resolution accordingly reviewed the history of the township's master plan and zone plan: The master plan and zone plan were respectively adopted in 1978 and 1979. Prior to 1979, the property in question was zoned R–10, and the other three corners of the intersection were zoned "business

highway." Under the newly adopted plans, the property in question remained R–10, while the other three corners were changed to highway commercial, which permitted similar uses as did the former business highway zone, but increased the minimum lot size from 11,500 square feet to 20,000 square feet.

The master plan and zone plan were revised six times between August 1979 and April 1982. The periodic review of the master plan, as required by *N.J.S.A.* 40:55D–89, was completed in July 1982. The reviewing body recognized that there had been "a continuous monitoring of the plan in light of the growth and development taking place within the Township," as exemplified by the six prior revisions, and concluded that no specific changes to the master plan or zone plan were necessary.

Subsequent to the July 1982 review, four more revisions were made to the master plan and zone plan (three in 1984, one in April 1986). Since 1979, there have also been numerous changes to the township's land development ordinance.

The resolution also recognized that the property in question had been the subject of previous applications for use variances. One application, which was denied in 1985, sought variances to develop a WaWa convenience store and additional retail stores, containing a total of 6,950 square feet.

After recounting this background, the resolution then explained:

In view of the foregoing, this Board is compelled to find that this zone was not inadvertently overlooked. There was an opportunity during the development of the 1978 master plan and [1979] zone plan[,][ ] during the periodic review of the master plan (1982)[,] at the time of the use variance application 1984, during the times of all revisions to the master plan, zone plan, and land development ordinance, to make note of this particular site and recommend a zone change for it. Given this set of facts, this Board finds that the municipality's master plan and zoning ordinance reflect contemporary needs and conditions: ... and the governing body has been kept informed of the provisions of the zoning ordinance that generate variance requests.

The board also found that plaintiff "has not reconciled, by an enhanced quality of proof, that the grant of the requested use variance can be reconciled with the ordinances [sic] continued omission of the proposed use from those permitted in the zone."

The Law Division judge affirmed on the ground that *Medici* applied and that the board's determination regarding the negative criteria was supported in the record.

█ The Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –136, authorizes use variances for special reasons, the affirmative criteria, provided that the "relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." *N.J.S.A.* 40:55D–70d. Thus, the Legislature has vested discretionary authority in boards of adjustment to grant or deny variance applications, *Kramer v. Board of Adj., Sea Girt,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965), and a board's denial of a variance is presumed to be valid, and may be reversed only if the denial was arbitrary, capricious or unreasonable. *Ibid.; Charlie Brown of Chatham, Inc. v. Board of Adj.,* 202 *N.J.Super.* 312, 321, 495 *A.*2d 119 (App.Div.1985).

In the present case, the board applied the principles announced in *Medici* where the Court recognized a "strong legislative policy favoring zoning by ordinance rather than by variance." *Medici, supra,* 107 *N.J.* at 23, 526 *A.*2d 109; *see also Feiler v. Fort Lee Bd. of Adj.,* 240 *N.J.Super.* 250, 255–56, 573 *A.*2d 175 (App.Div. 1990), *certif. denied,* 127 *N.J.* 325, 604 *A.*2d 600 (1991); *Chesterbrooke Ltd. Partnership v. Planning Bd. of Tp. of Chester,* 237 *N.J.Super.* 118, 567 *A.*2d 221 (App.Div.), *certif. denied,* 118 *N.J.* 234, 570 *A.*2d 984 (1989). In *Medici,* the Court addressed the second element of the negative criteria, *i.e.,* whether the variance will "substantially impair the intent and the purpose of the zone plan and zoning ordinance." *N.J.S.A.* 40:55D–70d. It reviewed the changes in New Jersey land use statutes effected by the MLUL. Those changes included the grant of full authority to boards of adjustment to grant use variances, *N.J.S.A.* 40:55D–70d; the requirement that zoning ordinances be consistent with the master plan, *N.J.S.A.* 40:55D–62a; the requirement that planning boards review and report on the master plan and zoning ordinance every six years, *N.J.S.A.* 40:55D–89; and the requirement of

annual reports by boards of adjustment on those zoning ordinance provisions involved in variance applications, *N.J.S.A.* 40:55D–70.1. *Medici, supra,* 107 *N.J.* at 18–20, 526 *A.*2d 109.

After reviewing those changes, the Court described their significance to the variance process:

> The specific legislative changes in our statutes regulating land use and zoning reflect significant policy decisions by the legislature concerning the proper relationship between use variances and zoning ordinances. The power to grant use variances has been shifted from the governing body, whose responsibilities include enactment of the zoning ordinance, to the board of adjustment. This shift of authority undoubtedly reflects the legislature's determination that boards of adjustment possess special competence to decide use-variance applications, and that absent an appeal no participation by the governing body is necessary. However, delegation of the authority to grant use variances to boards of adjustment increases the likelihood that such variances may conflict with the intent of the master plan and zoning ordinance to a greater extent than was the case when the power to grant them was vested in the governing body. Tension between use variances and the zoning ordinance and master plan is less likely in those municipalities that authorize appeals from the grant of use variances to the governing body.
>
> [*Id.* at 19–20, 526 *A.*2d 109.]

The Court also noted the significance to the variance process of an informed governing body's inaction:

> Thus, the mandatory re-examination by the planning board of the master plan and zoning ordinance, at least every six years, is intended to inform the governing body of the need for revisions in the plan and ordinance based on significant changes in the community since the last such re-examination. Similarly, the annual reports by boards of adjustment summarizing variance requests throughout the year and recommending amendments to the zoning ordinance are designed to avoid successive appeals for the same types of variance by encouraging the governing body to amend the ordinance so that such appeals will be unnecessary. *When an informed governing body does not change the ordinance, a board of adjustment may reasonably infer that its inaction was deliberate.* [Emphasis supplied.]
>
> [*Id.* at 20–21, 526 *A.*2d 109.]

The Court concluded that satisfaction of the second element of the negative criteria required "an enhanced quality of proof and clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." *Id.* at 21, 526 *A.*2d 109. Based on the applicant's proofs, a board must "reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district." *Ibid.* The Court

noted, however, that "[r]econciliation on this basis becomes increasingly difficult when the governing body has been made aware of prior applications for the same use variance but has declined to revise the zoning ordinance." *Id.* at 21–22, 526 *A.*2d 109.

■ In the present case, the board's determination under *Medici* that plaintiff had not established the second element of the negative criteria is supported in the record, as the Law Division ruled. The issue, however, is whether *Medici* fully applies in this case.

■ *Medici,* unlike the present case, involved a variance application based on the particular suitability of the site for construction and operation of a motel. *Id.* at 4, 526 *A.*2d 109. Thus, in *Medici* the applicant had to establish that the proposed "use promotes the general welfare because the proposed site is particularly suitable" for it. *Ibid.* A variance application on that ground does not involve an attack on the appropriateness of the existing zoning as applied to the applicant's lands. The present application, however, grounds the special reasons standard in undue hardship, *i.e.*, "that the property cannot reasonably be developed with a conforming use." *Id.* at 4 n. 1, 17 n. 9, 526 *A.*2d 109. An undue hardship application calls into question the reasonableness of the zoning applicable to the tract in question. Unfortunately, the board did not address plaintiff's hardship claim in its resolution. The only reference to the affirmative criteria is paragraph 8(k) of the resolution in which the board erroneously states that "the applicant did not offer any special reasons for the granting of the proposed use variance."

■ We conclude that the board must determine whether plaintiff established the basis for a hardship variance, because the existence of an economic hardship as the affirmative criterion necessarily colors the board's consideration of the negative criteria. *Cf. Sica v. Board of Adjustment of Tp. of Wall,* 127 *N.J.* 152, 603 *A.*2d 30 (1992) (when proposed use is inherently beneficial *Medici* does not require satisfaction of negative criteria by en-

hanced standard). We are persuaded that the *Medici* requirement of "an enhanced quality of proof ... that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance," *Medici, supra,* 107 *N.J.* at 21, 526 *A.*2d 109, cannot apply with all its vitality to a hardship variance. We reach this conclusion because the *Medici* requirement is grounded in a preference for zoning by ordinance rather than by variance. *See Sica, supra,* 127 *N.J.* at 161–62, 603 *A.*2d 30 (*Medici* "emphasized that ... rezoning ... should be accomplished not by a board of adjustment through the liberal grant of use variances for commercial purposes, but by the governing body through amendment to the zoning ordinance"). That rationale is diluted if the ordinance has zoned the particular tract into economic inutility.

There is no question that plaintiff must also establish the negative criteria even if plaintiff establishes economic hardship. The statute requires it. *See Harrington Glen, Inc. v. Municipal Bd. of Adj.,* 52 *N.J.* 22, 29–30, 243 *A.*2d 233 (1968); *Gougeon v. Board of Adj.,* 52 *N.J.* 212, 223–24, 245 *A.*2d 7 (1968). But faced with an apparent economic hardship caused by the zone plan, "consideration of the utmost fairness must be given to an application for a variance," *Harrington Glen, supra,* 52 *N.J.* at 29, 243 *A.*2d 233, for "restraint upon all practical use, such as that which would follow from denial of a variance," may amount to a confiscation of property. *Ibid.* Thus, in that context, the zoning ordinance, as applied to the "confiscated" tract, may be unreasonable, *cf. AMG Associates v. Township of Springfield,* 65 *N.J.* 101, 111–12, 319 *A.*2d 705 (1974), and the zoning board must evaluate the negative criteria in that light. It would be jarringly anomalous to indulge a preference for zoning by ordinance if the ordinance results in confiscation of the applicant's property.

A board of adjustment in considering the negative criteria in a case in which undue hardship has been demonstrated must attempt to harmonize the zone plan with the grant of a variance. It may seek to achieve that result, through, for example, buffering requirements or reductions in density of development. *See AMG*

*Associates, supra*, 65 *N.J.* at 109 n. 3, 319 *A.*2d 705 ("The agency has authority to condition the use as is appropriate in the particular situation. The negative criteria of the statutory section can thereby ordinarily be met.").

We reverse the judgment below and remand to the board. Because the application is now five years old, we anticipate that the parties will present fresh evidence. On remand, the board must consider and make findings and state conclusions regarding the affirmative criteria as well as the negative criteria. In the event plaintiff establishes the affirmative criteria based on economic inutility the board shall evaluate the negative criteria in light of this opinion. We do not retain jurisdiction.