OPINION OF THE COURT
ROSENN, Circuit Judge:
This appeal has its origin in BAPS’s[1] application to the North Bergen Board of Adjustment (BOA or “the Board”) for a use variance which would permit BAPS to use the subject property as a temple for Hindu worship. BAPS had agreed to purchase the property from the trustee in bankruptcy for Four Three Oh, Inc. on the condition that it receive approval from the *110 Township of North Bergen for its desired use. The application process dragged on for over two years, and finally culminated in the BOA’s insistence that BAPS hire off-duty police officers to direct traffic and insure compliance with the occupancy limit for the temple set by the BOA. The Bankruptcy Court held that this condition was unreasonable and issued an injunction requiring the BOA to allow BAPS to use its own uniformed volunteers for traffic direction and occupancy limit compliance. The BOA appealed this order to the United States District Court for the District of New Jersey, which affirmed. The Board timely appealed to this Court. We also affirm.
I.
This controversy began in November of 1998, when the United States Bankruptcy Court approved the sale to BAPS of the subject property which previously had been owned by Four Three Oh, Inc., a debtor in Chapter 11 proceedings. The sale of the property, which had been used by the prior owner as a nightclub, was contingent upon BAPS obtaining permission from the BOA to use the land as a house of worship.
BAPS applied to the Township of North Bergen for a Certificate of Occupancy to permit the property to be used as a place of worship. Because the property is located in an industrial zone, the Township denied the application on the ground that a use variance was required under New Jersey law. BAPS then filed an application for the necessary use variance with the BOA, who scheduled the matter for a hearing in January, 1999.
Over the next several months, the BOA repeatedly postponed the hearing. As a result, the Chapter 11 trustee and BAPS jointly commenced an adversary proceeding in the Bankruptcy Court seeking an injunction requiring the BOA to grant BAPS’s pending application for a variance. The Bankruptcy Court denied the injunction, but remanded the matter to the BOA for a hearing, ordering it to issue a final decision on the BAPS application by October 6,1999.
The first remand hearing occurred on September 22, 1999. The BOA heard testimony from several experts, including Derrick McGrath, the BOA’s engineer, who identified numerous problems with the site that BAPS needed to address. Most of these problems were later discussed by BAPS’s engineer, Bhaskar Ha-lari, who explained that BAPS could and would remedy them. One of the chief problems McGrath identified was the fear that the property had insufficient parking spaces to accommodate its anticipated use. In response to this concern, Kishor Joshi, BAPS’s architect, testified that BAPS was willing to limit the temple’s occupancy based on the number of available parking spaces.
The number of parking spaces that would be available for worshippers’ use is a matter of dispute. Part of the land on which the former nightclub was situated is currently leased to a fast food restaurant (Taco Bell). Although Taco Bell’s lease is silent on the issue of parking, Michael Kauker, the North Bergen town planner, had previously testified that, based on the number of seats in Taco Bell, the restaurant was entitled to exclusive use of 27 parking spaces. Joshi accepted this conclusion and calculated that the temple would be left with 165 spaces. He offered to limit the occupancy of the temple to 3.5 persons per parking space, or 578 persons.
The BOA then heard testimony from Michael Maris, BAPS’s traffic expert. He testified that he had studied the traffic conditions on the avenue adjacent to the *111 property and, using a “peak load factor” of .9, he calculated that the property would have a C Level of Service,[2] acceptable under Federal standards. Maris based this calculation on BAPS’s agreement to limit itself to 165 parking spaces.
On September 28, 1999, the BOA heard testimony from its own traffic consultant, Hal Simoff. Using the same methodology as Maris, he concluded that the temple’s driveways would operate unsafely, with a level of service rating of F. However, Si-moff used a peak load factor of .7, which, on cross examination, he conceded was incorrect. He then agreed that a peak load factor of .82 would be more appropriate and would yield a D Level of Service, which Maris testified was still acceptable (under federal standards). Simoff later testified that, based on his reading of the metes and bounds description in the Taco Bell lease, Taco Bell was entitled to 65 parking spaces. Although it received notice of this litigation, Taco Bell never appeared or asserted any claim.
Between the second and final scheduled hearing dates, BAPS wrote a letter to the BOA offering to limit its occupancy to 505 persons, even though the number of available parking spaces would permit a building occupancy of 578 persons under the relevant North Bergen ordinance. Under the ordinance, a building with an occupancy limit of 505 required only 143 parking spaces.
The final hearing on the BAPS application took place on October 6, 1999. Simoff again testified at this hearing, but this time he limited his testimony to BAPS’s existing facility in nearby Edison Township. Simoff claimed that BAPS had misrepresented its proposed use of that facility before the Edison land use board and that BAPS had made architectural changes to the Edison building without first obtaining the requisite municipal approval. However, Simoff once again retracted his testimony on cross-examination when confronted with approved site plans for the Edison facility. These plans proved that BAPS had, in fact, obtained the approval of the township before altering its building.
At the end of the final hearing, the BOA denied BAPS’s application for a variance, citing occupancy, traffic, and parking problems. BAPS appealed this decision to the Bankruptcy Court, which reversed the denial, concluding that the Board had acted arbitrarily in refusing to consider reasonable restrictions that would alleviate problems with occupancy, parking, ingress and egress. The Court remanded the application back to the Boar d to consider such restrictions.
On remand, the BOA required, as a condition of granting the variance, that BAPS hire off-duty police officers to monitor traffic entering and exiting its parking lot. This condition was financially burdensome and, as it turned out, impossible to fulfill, because the chief of police later informed BAPS that off-duty officers were not available. The BOA refused BAPS’s offer to have its own volunteers perform this function, and BAPS once again brought the matter to the attention of the Bankruptcy Court. This time, the Court held that this condition was arbitrary and unreasonable. It vacated the proposed condition and ordered BAPS’s application for a variance approved, allowing BAPS volunteers to monitor the trafficflow in the temple parking lot. The BOA appealed *112 this or der to the District Court, which affirmed.
II.
 The first question before us is whether the District Court applied the correct standard of review. The District Court reviewed the bankruptcy court’s factual findings for clear error, while subjecting its legal conclusions to plenary review. Although this is the standard that normally applies to appeals from bankruptcy decisions, see In re Sharon Steel Corp., 871 F.2d 1217, 1223 (3d Cir.1989), this case reached the District Court in an unusual procedural posture. The Bankruptcy Court had effectively reviewed the decision of the Board of Adjustment, an administrative body created under state law. Under similar circumstances, the Court of Appeals for the Eight Circuit explained the standard of review as follows:
[W]e are reviewing neither the legal rulings of the bankruptcy court nor its findings of fact. We are reviewing the judgment of a district court affirming a bankruptcy court decision giving effect to a decision of the [administrative agency]. In substance, we are reviewing the decision of an administrative agency.
Bankruptcy Estate of United Shipping v. General Mills, 34 F.3d 1383, 1390 (8th Cir.1994). (internal citations omitted).
When a federal court reviews a decision of a state agency, it must grant that agency’s factual findings the same degree of deference to which they would be entitled if they were reviewed by a state court. See AT & T Wireless PCS v. Winston-Salem Zoning Board, 172 F.3d 307, 315 (4th Cir.1999). If the BOA’s decision had been reviewed in the state court system, the Law Division of the New Jersey Superior Court would have exercised a deferential standard of review. Its review would have been limited to determining whether the BOA’s decision was supported by “substantial evidence” and whether it was “arbitrary, unreasonable or capricious.” Pullen v. S. Plainfield Planning Bd., 291 NJ.Super. 303, 311-12, 677 A.2d 278, 282 (Law Div.1995) (“Pullen I”). The Law Division would have acted as a reviewing court, not a trial court, and would have reviewed the BOA’s factual findings based on the record of the proceedings before the BOA. See Pullen I, 291 NJ.Super. at 312, 677 A.2d 278.
On appeal, the Appellate Division’s review of the Law Division’s decision would have been de novo. The Appellate Division would have conducted its own review of the record before the BOA, using the same arbitrary and capricious standard. See Pullen v. Township of S. Plainfield Planning Bd., 291 N.J.Super. 1, 6, 676 A.2d 1095, 1097 (App.Div.1996) (“Pullen II").
In this case, the Bankruptcy Court applied the correct, deferential standard of review, but the District Court did not. When the Bankruptcy Court’s decision was appealed to the District Court, the District Court functioned as a second-level reviewing court. Its standard of review should have been plenary. See, e.g. AT & T Wireless, 172 F.3d at 314-315; C.K. v. New Jersey Dept. of Health & Human Services, 92 F.3d 171 (3d Cir.1996); Bankruptcy Estate of United Shipping v. General Mills, 34 F.3d 1383 (8th Cir.1994).
In similar cases in which the District Court, functioning in an appellate capacity, applied the wrong standard of review, we have nevertheless reached the merits of the appeal.[3] In light of the *113 already long duration of this litigation in the court below, we will not remand but decide the merits. For reasons fully discussed hereinafter, we believe the record of the BOA proceedings reveals that it acted arbitrarily, capriciously and unreasonably in denying the variance sought by BAPS. As we explain in Part III, the District Court did not err in affirming the decision of the Bankruptcy Court.
III.
Under New Jersey law, a town planning board should grant a variance for a proposed land use that is “inherently beneficial” if the applicant satisfies a four-prong test. See Sica v. Board of Adjustment of the Township of Wall, 127 N.J. 152, 165-66, 603 A.2d 30 (1992). The parties here agree that the proposed temple constitutes an “inherently beneficial” use of the subject property. Accordingly, the Sica decision requires the BOA to first identify the public interest involved and then identify the “detrimental effect that will ensue from the grant of the variance.” Id. at 165-66, 603 A.2d 30. Next, the Board should, when possible, consider reasonable conditions on the use that would reduce its detrimental effect. See id. Finally, the Board should “weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.” Id. In doing so, the Board should reduce the weight of the negative criteria to the extent that their effect could be reduced by the imposition of reasonable conditions. See id.
We agree with the District Court and the Bankruptcy Court that the Board failed to seriously undertake the balancing test required by Sica. The BOA cited three negative criteria to support its denial of the variance: alleged overuse of the BAPS facility in Edison, a shortage of parking, and traffic problems. The record shows little support for any of these concerns. First, as the Bankruptcy Court noted, there is no evidence in the record, except for Simoffs discredited testimony, to support the allegation that BAPS misrepresented its anticipated use to the Edison board.
The Board also relied on Simoffs admittedly faulty analysis to support the conclusion that BAPS’s proposed use of the site would cause traffic problems. Simoff himself conceded that the peak load factor used by BAPS’s traffic expert, which led to the conclusion that the Temple would not unduly hamper traffic, was more appropriate than the one he used, and would yield an acceptable Level of Service. Thus, we agree that the Board’s reliance on Simoffs traffic calculations was unreasonable.[4]
Furthermore, the Temple’s peak hours of operation would fall on Sunday evenings from four to nine p.m. According to Maris’s uncontradicted testimony, which was based on his personal knowledge and *114 study of local traffic conditions, Route 1 & 9 is not heavily trafficked during those hours. Maris testified that the traffic problems on Routes 1 & 9 occur during weekday commuter hours. Although BAPS does offer services during those hours, its experience at its Edison facility reflects that week-day services are sparsely attended, usually drawing only 10-15 worshippers.
Finally, the Board’s concern about parking also lacks a foundation. Here, again, the Board relied on the testimony of Si-moff, a non-lawyer, who opined that, based on his reading of the Taco Bell lease, Taco Bell was entitled to 65 parking spaces. The lease, however, is silent on the issue of parking.[5] Moreover, Simoffs testimony was contradicted by that of North Bergen’s own town planner, who testified that Taco Bell needed only 27 spaces, which would leave BAPS with more than enough parking for a temple with an occupancy limit of 505. Finally, we note that, four years ago, this Board approved the use of this very site as a nightclub. Although the nightclub’s occupancy limit was 700, the Board expressed no concern over the amount of available parking. The existence of this prior approval calls into question the genuineness of the BOA’s contention that it denied the BAPS application due to inadequate parking.[6]
Even if there were some factual basis for the concerns articulated by the Board, we would still affirm the judgment of the District Court because the Board shirked its duty under Sica to seriously consider conditions designed to alleviate any negative impact that would flow from the grant of the variance. The record reveals that BAPS proposed numerous conditions, from reducing the size of its prayer hall to reducing the occupancy limit of its temple, which should have quieted the Board’s concerns about over-use, parking and traffic. The Board rebuffed all of these proposals for no apparent reason. Its president simply concluded that “no organization would voluntarily limit its membership.”[7]
Finally, we also note that the Bankruptcy Court vacated the condition that the Board ultimately chose to impose on BAPS’s use of the site, the hiring of off-duty police officers at BAPS’s expense to direct traffic and monitor compliance with the occupancy limit. We agree with the Bankruptcy Court that this condition was arbitrary and unreasonable. The Board refused to allow BAPS’s own volunteers to direct traffic and monitor occupancy, eon- *115 eluding that they could not be trusted to do so. We believe that this conclusion, which has no basis in the record, further supports the Bankruptcy Court’s decision that the Board acted arbitrarily and unreasonably in denying the variance.
IV.
In sum, we agree with the Bankruptcy Court that the Board acted arbitrarily and unreasonably. The judgment of the District Court will be affirmed. Costs taxed against appellant.

. BAPS is an acronym. The full name of the organization is Bochasanwasi Shree Akshar Purushottam Swaminarayan Sanstha.

. A property's "Level of Service” refers to the amount of time it takes a vehicle to exit the driveway. Level of Service A means a delay time of less than ten seconds. Level of Service F, which is generally unacceptable, means a delay time of greater than 50 seconds. The property currently operates with a "B" Level of Service.

. See, e.g., In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 263 n. 2 (3d Cir.1991) (finding that the District Court had applied the wrong standard of review when reviewing a Banlc- *113 ruptcy Court’s decision and proceeding to reach the merits of the appeal); In re Ver-tientes, Ltd., 845 F.2d 57, 58 & 59-60 (3d Cir.1988) (same).

. The dissent contends that Simoffs error in calculation "related only to the ability of cars to exit the proposed temple’s parking lot, leaving unaffected any conclusions about ... the ability of cars to enter the lot.” (Dis. op. at 16). However, Maris testified that the ability of vehicles to exit the site was the most critical consideration in analyzing the feasibility of the proposed use. He stated that, because cars attempting to enter the proposed lot only need to make a right turn off Route 1 and 9, "the entering traffic is not critical.” He also testified that the number of vehicles attempting to enter the parking lot at the peak entering hour was far lower than the number of cars attempting to exit at the peak exiting hour. Neither of these conclusions has been contradicted.

. We also note that, although Taco Bell has received notice of the existing action, it has not appeared to defend its right to any parking spaces.

. The dissent asserts that the BOA approved the use of the site as a nightclub because a nightclub attracts patrons "late at night when street parking may be more availabte and trafficflow is lighter.” (D.C. at 18) This is pure speculation. Nothing in the record suggests that parking on Route 1 and 9 is available late at night, but not on Sunday evenings. Moreover, contrary to the dissent’s suggestion, Maris testified that entry into and exit from the parking lot would be more evenly spread throughout the temple’s hours of operation than would entry to and exit from a church or synagogue. He stated that, at BAPS’s temple in Edison, “people kept coming in throughout the day.”

. The dissent believes that it was reasonable for the BOA to question whether BAPS would be willing to turn people away at the door once 505 people had entered the temple if there was room for more. (Dis. op. at 17). On the contrary, it is unreasonable and unfair for the BOA to postulate in the absence of any evidence that BAPS would violate its agreement to limit occupancy. Occupancy limits are quite common in dance halls, dining rooms, elevators and other structures. Besides, if BAPS were to violate this condition of the variance, the Township has a legal remedy by injunction or rescission of the variance.