213 N.J. Super. 376 (1986)
517 A.2d 486
STEPHEN LAZOVITZ, PLAINTIFF-RESPONDENT,
v.
BOARD OF ADJUSTMENT, BERKELEY HEIGHTS, NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 1986.
Decided October 28, 1986.
*378 Before Judges KING, HAVEY and MUIR.
Daniel S. Bernstein argued the cause for appellant (Bernstein, Hoffman & Clark, attorneys; Daniel S. Bernstein and Suzanne T. Bogad on the brief).
J. Alan Drummond argued the cause for respondent (Drummond & Owren, attorneys; J. Alan Drummond on the brief).
PER CURIAM.
This case comes before us on an expedited basis. Our opinion supplements one given orally on October 8, 1986 at Trenton.
Defendant appeals a trial court reversal of its denial of a use variance to construct a four-story nursing home in a single-family residential zone.
Plaintiff, purchaser under contract of approximately 4.7 acres on Springfield Avenue, Berkeley Heights, made application to defendant to construct a 58-foot high, 5-story nursing home containing 240 beds. Plaintiff subsequently amended its plans to encompass a 46-foot high, 4-story nursing home for 180 beds. The property was zoned R-15, single-family residential.
At time of application, plaintiff held a certificate of necessity from the State Department of Health. The certificate authorized the construction of a 240-bed nursing home anywhere in Union County.
Plaintiff presented testimony from its president, a former employee of the State Department of Health, an architect, a traffic expert, a real estate expert, a planning consultant and several other witnesses. The Chairman of the Berkeley Heights Planning Board and several property owners testified *379 in opposition. The supervisors of the Berkeley Heights Water Pollution Control Plant, which is contiguous with the subject property, also testified.
Defendant, in its resolution denying the application, made the following factual findings:
A. The Subject Property

1. The subject property contains 4.774 acres.
2. The subject property is located on Springfield Avenue. That portion of Springfield Avenue which is located in the R-15 Zone has been developed almost exclusively by permitted uses.
3. Practically all of the property in the R-15 Zone along Springfield Avenue is occupied by single family residences. This Board recently granted a variance for a 9,840 square feet office building for two doctors, Aquino and Galanti, for property located at 261 Springfield Avenue. The front of that property was in the B Zone and the rear of the property, which was to be used for parking, was in a residential zone. A principal justification for that variance was that the property had an approved variance, which was valid, for an 11,200 square feet office building and the necessary parking.
4. There are no constraints, except for that portion of the site in the flood plain, which would preclude construction on the subject property.
5. In front of the subject property are four one family residences.
6. To the rear of the subject property is land which is owned by the Township of Berkeley Heights. Situated on that property is a drainage channel and an equalization basin which is discussed in a subsequent section of this Resolution.
7. Daisy Road is a paper street to the west of the site. The subject property could be developed for single family residential use in conjunction with improvements to Daisy Road.
8. The applicant offered to acquire deed restrictions for the four single family residences in front of the subject property which would restrict the use of the homes to a residential use for the next fifty years.
9. The deed restriction would not be needed but for the Lazovitz variance application.
B. The Proposal

10. The application was bifurcated. A use variance was sought for the nursing home. In the event that it was granted, the applicant would then seek site plan approval.
11. The applicant initially informally requested a two story, 240 bed nursing home and a medical day care center for 27 persons.
12. The applicant revised its original plans to show a five story nursing home which was 58 feet high.
13. The application which is presently before this Board is for a four story nursing home which would be 46 feet 8 inches high. However, the present plan shows the finished first floor elevation at 213.0 feet. This level is the flood *380 level as shown on the HUD Flood Insurance Map on file in the Township Engineer's Office. To satisfy the flood level question, the building would have to be raised, which would increase the above ground building elevation.
14. There are no structures within the vicinity of the subject property which are four stories tall or reach a height of 46 feet 8 inches. The sole zones in Berkeley Heights which permit buildings to have a height of over 35 feet are the OR, LI, and OL Zones. The OR Zone requires a minimum lot size of twenty acres.
15. The applicant proposes to have 80 parking spaces, which requires a variance for insufficient parking.
16. According to a plot plan which the applicant submitted for the Union Manor Nursing Center, prepared by Mastrian and Mastrian, Architects, dated July 26, 1984, the proposal would have 8.6% building coverage and 29.5% total impervious lot coverage.
17. The applicant estimated that he would have a day staff of between 60 and 65 persons.
C. Equalization Basin

18. To the rear of the subject property is land owned by the Township of Berkeley Heights. Behind the drainage channel is an equalization basin which is used in conjunction with the Berkeley Heights sanitary sewer system.
19. The Board heard testimony from Mr. Joseph F. Durso, the Supervisor for the Berkeley Heights Water Pollution Control Plant.
20. Mr. Durso testified that the Berkeley Heights sewer plant had a maximum capacity of 3.1 million gallons a day. Under normal use, between 1.5 and 1.7 million gallons a day flow through the plant.
21. Heavy storms create abnormal water conditions which lead to infiltration into the sewer plant. When this occurs, or overflow for other reasons, the plant gives secondary treatment to the water and pipes it to the equalization basin.
22. If the equalization basin becomes full, the excess water is released to the Passaic River. After the storm subsides, water remaining in the basin flows by gravity feed into the tertiary treatment facility.
23. Mr. Durso testified that there has only been one complaint about the basin emitting odor. That problem was caused by algae. Since then, there have been regular maintenance schedules which include the removal of algae from the basin. There have been no subsequent objections.
24. The Board finds that the top of the basin is approximately eight feet above the ground.
25. Five feet tall pine trees are located between the basin and the subject property.
It then made the following conclusions:
A. The subject property is uniquely unsuitable for a nursing home, and is suitable for single family residences.
B. If a nursing home were erected on the subject property, it would degrade the Zone Plan and would impinge on the residential character of the area.

*381 C. While a nursing home is not appropriate for the site, what is proposed by the applicant is extremely detrimental in terms of height and visibility.
D. The proposed four story nursing home would be a minimum of 46 feet eight inches high and probably more, as a result of constructing the building over the flood plain elevation.
E. The proposed building would be the highest structure in the area. Rather than providing a buffer or transitional use to Springfield Avenue, it would necessitate buffering and might require transitional uses.
F. This Board envisions subsequent applications for variances based on the proximity to the nursing home.
G. Both the Zoning Ordinance and the Master Plan envisioned residential development of the area. The proposed nursing home would be out of character with both the proposed and actual development in the neighborhood.
H. The proposed nursing home would have a substantial negative impact on the single family residences in the neighborhood as well as the Zone Plan and the Zoning Ordinance of the Township of Berkeley Heights.
I. While any nursing home would promote a number of the purposes of zoning, there was a complete absence of proof that the proposed nursing home would satisfy any of the purposes of zoning by being located on the subject property. While a slightly higher residential density for the property might be appropriate, as mentioned by Board Member Elward, there is no basis for the large nursing home on the site.
K. The Board discounted the testimony of a number of the applicant's witnesses including his Planner. The applicant refused to extend the time period for the Board to act and, as a result, it was precluded from retaining its own Planner. The decision in the present matter was reached on a split vote. The testimony by an independent planner who was retained by the Board of Adjustment may have coalesced the Board into a more unified position.
In the course of reaching those conclusions and as part of its findings, the Board found plaintiff's real estate expert lacking in credibility and plaintiff's planning expert unfamiliar with Berkeley Heights development.
The trial court visited the site of the proposed variance. In reversing the defendant, the court found a nursing home an inherently beneficial use relying on Urban Farms Inc. v. Franklin Lakes, 179 N.J. Super. 203, 213-214 (App.Div. 1981), certif. den. 87 N.J. 428 (1981). The court then went on to disagree with the defendant's conclusions that the negative criteria of N.J.S.A. 40:55D-70 had not been satisfied. In doing so, the court stated:

*382 While these conclusions [of the defendant] may be based on facts as believed by some of the members of the Board of Adjustment, after inspecting the property in question this court cannot support such findings.
The court then went on to recite facts which it found in the inspection, and to rely on those facts to counter the defendant's findings and conclusions.
Finally, the court, relying on Baptist Home of South Jersey v. Boro. of Riverton, 201 N.J. Super. 226 (Law Div. 1984), weighed the inherently beneficial reasons for having a nursing home against the negative criteria and concluded the former outweighed the latter, requiring reversal of the defendant.
The judgment of the trial court is reversed. While we find no error in the trial court's conclusion regarding the inherently beneficial nature of the nursing home, Urban Farms Inc. v. Franklin Lakes, 179 N.J. Super. at 213-14, it improperly rejected defendant's ruling on the negative criteria. The defendant determined plaintiff failed to satisfy the negative criteria of the statute, N.J.S.A. 40:55D-70. That determination was subject to a presumption of validity. Kramer v. Bd. of Adjust., Sea Girt, 45 N.J. 268, 296 (1965). We conclude under the holding of Kramer that while the findings of the defendant respecting the negative criteria may be debatable, they are not so clearly an abuse of discretion as to justify a declaration of judicial invalidity, and the trial court should have deferred to the defendant's findings. Id. at 296-97.
Furthermore, the trial judge improperly made independent fact findings based upon his visit to the site of the proposed nursing home. The judge had the right to visit the site to better understand the evidence in the case, but he could not go outside the record and base his ruling on facts gleaned from a personal inspection. Peoples Trust Co., etc. v. Hasbrouck Heights, etc., 60 N.J. Super. 569, 576 (App.Div. 1959).
Moreover, we disagree with the holding of Baptist Home of South Jersey v. Boro. of Riverton. N.J.S.A. 40:55D-70, by its plain language, requires an applicant for a use *383 variance to establish special reasons and to establish the negative criteria. Grundlehner v. Dangler, 29 N.J. 256, 271 (1959). We are not free, by judicial plastic surgery, to change that plain language. See Watt v. Mayor and Council of Borough of Franklin, 21 N.J. 274, 277 (1956). The concepts of special reasons and negative criteria are independent and separate requirements of proof not to be integrated into some kind of balancing test.
Finally, it must be noted that variances to allow non-conforming uses should be granted only sparingly and with great caution since they tend to impair sound zoning. Kohl v. Mayor and Council of Fair Lawn, 50 N.J. 268, 275 (1967). The suggested impairment of the zoning plan and zoning ordinance found by the defendant, supported by credible evidence in the record, required a dismissal of plaintiff's complaint.
Reversed.