704 A.2d 1271

SMART SMR OF NEW YORK, INC. D/B/A NEXTEL COMMUNICA-
TIONS, PLAINTIFF–RESPONDENT, v. BOROUGH OF FAIR LAWN
BOARD OF ADJUSTMENT, DEFENDANT–APPELLANT.

Argued October 7, 1997—Decided January 26, 1998.

310

*Harold Hoffman,* argued the cause for appellant.

*Gregory J. Czura,* argued the cause for respondent.

*Richard D. Stanzione,* submitted a brief on behalf of amici curiae Bell Atlantic NYNEX Mobile, Inc., Sprint Spectrum, L.P. and Omnipoint Communications, Inc. (*Hiering, Dupignac & Stanzione,* attorneys; *Mr. Stanzione* and *Alison B. Brotman,* on the brief).

*Robert C. Garofalo,* submitted a brief on behalf of amicus curiae Cellular Telephone Company d/b/a AT & T Wireless Services (*Garofalo & Pryor,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

At issue is whether respondent, Smart SMR of New York, Inc., d/b/a Nextel Communications (Smart), is entitled to a use variance under *N.J.S.A.* 40:55D–70(d) ("subsection d" or "use variance") to erect a 140–foot telecommunications "monopole" in an industrial zone in the Borough of Fair Lawn. The Fair Lawn Board of Adjustment (the Board) denied Smart's application for a use variance, and the Law Division affirmed. In an unreported opinion, the Appellate Division reversed. We granted the Board's petition for certification, 148 *N.J.* 460, 690 *A.2d* 608 (1997), and now affirm the judgment of the Appellate Division as modified.

## I.

Beneath the surface of this appeal stretches the tension between the need for telecommunications in an increasingly technological society and local land use control of sites for mobile communications facilities. In today's world, prompt and reliable information is essential to the public welfare. Evidencing the need for such information is the proliferation of wireless communications instruments such as mobile phones, which rely on antennas for the transmission of signals. For successful transmission, the antennas often are placed on tall structures such as buildings, towers, or, as here, monopoles. Towers and monopoles, which may reach several hundred feet in height, sometimes exceed height restrictions set by municipal land use ordinances. Consequently, telecommunications carriers may need relief from those ordinances to construct needed towers or monopoles. Ultimately, the selection of a site for a mobile communications facility and the need to erect a tower or monopole may depend on both local considerations and the design of the telecommunications network.

In the present case, Smart's interest in constructing a mobile communications facility with a monopole in Fair Lawn conflicts with the Board's interest in controlling the size and location of the monopole. Resolution of the conflict summons an appreciation of the rights of municipalities to regulate the use of land within their boundaries, the rights of carriers to construct and use essential telecommunications facilities, and the public interest in both reasonable land use regulations and a reliable telecommunications network.

Guiding us in resolving the conflict are federal and state statutes as well as judicial decisions. The statutes include the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D-1 to -136; the New Jersey Radiation Protection Act (Radiation Act), *N.J.S.A.* 26:2D-1 to—23.4, and the Telecommunications Act of 1996 (Telecommunications Act), Pub.L. No. 104–104, 110 Stat. 56 (codified as amended in scattered sections of 15 *U.S.C.A.*, 18 *U.S.C.A.*, and ·47 *U.S.C.A.*).

## II.

Our analysis begins with Congressional legislation addressing the relative rights of local land use agencies and telecommunications carriers. Congress has authorized the Federal Communications Commission (FCC) to license carriers to provide wireless telecommunications services. 47 *U.S.C.A.* § 301 (West 1997). Pursuant to that authorization, the FCC has licensed Smart to install an "enhanced specialized mobile radio" (ESMR) system in six metropolitan areas, including the New York metropolitan area, an interstate area that includes New Jersey. The ESMR system is a digital telecommunications system that provides services similar to those of cellular telephone systems.

According to Smart, its digital ESMR system is an improvement on cellular telephone systems. The ESMR system provides clearer signals, enhanced protection against eavesdropping, as well as paging and dispatch services. Smart anticipates that trucking companies, livery services, as well as police, fire, and emergency medical services will use its dispatch, data, and paging services. Although the Board did not so find, Smart anticipates that the general public also will use its services.

The uncontradicted testimony before the Board establishes that Smart needs a mobile communications facility in Fair Lawn to operate its ESMR system. Such a system depends on multiple, low-power mobile communications facilities to provide service both to local communities and to mobile users passing through those communities. The proposed facility will require construction of a 140–foot "monopole" (ESMR monopole) for antennas used in transmitting and receiving ESMR signals. The ESMR monopole would be narrow, only three-feet wide at the base and less than two-feet wide at the top. Twelve panel antennas measuring 18" × 25" would be arranged in a triangular support, with four antennas on each face.

Smart seeks to locate the facility and monopole on a two and one-half acre site on Rosalie Street in the I–2 industrial zone (Fair Lawn site). Commercial or industrial uses bound the Fair Lawn

site on three sides, and single family residences abut the remaining side. Permitted uses in the I–2 zone include manufacturing, and warehousing, as well as hospital and public utility services. Already on the Fair Lawn site are a warehouse and a parking and loading area. With the exception of public utility structures, no structure in the I–2 zone may exceed 40 feet in height.

Also located in the vicinity of the Fair Lawn site is a 90–foot monopole, which is used to provide cellular telephone service. The owner of that monopole is a partnership consisting of NYNEX Mobile communications, Bell Atlantic Mobile Systems, and Empire Cellular (NYNEX).

Before Smart submitted its application, the Fair Lawn Planning Board had decided that NYNEX was a public utility. That decision exempted NYNEX's monopole from height restrictions. Originally, Smart requested the Board to declare it to be a public utility, so its monopole would likewise be exempt from height restrictions. The Board, however, denied Smart's request. Similarly, the Appellate Division denied Smart's request to be treated as a public utility. We denied Smart's cross-petition for certification on that issue. 148 *N.J.* 460, 690 *A.*2d 608 (1997). Consequently, the issue whether Smart should be considered a public utility is not before us. *But see New Brunswick Cellular Tel. Co. v. Zoning Bd. of Adjustment,* No. L–00620–96, 1997 WL 800364, 307 *N.J.Super.* 560, 704 *A.*2d 1371 (N.J.Super. Ct. Law Div. Jan. 29, 1997) (reversing denial of conditional use variance for monopole when Board of Adjustment recognized telecommunications carrier as public utility).

Because the Board denied Smart the status of a public utility, Smart sought a use variance. From August 1993 to June 1994, the Board conducted ten hearings on Smart's use variance application. In support of its application, Smart introduced several expert witnesses. Smart's "zoning specialist," Julie Mills, explained that Smart chose to locate the mobile communications facility in Fair Lawn because radio-frequency-engineering studies indicated that a Fair Lawn site was necessary for the operation of

Smart's ESMR system. Mills further explained that Smart selected the Fair Lawn site only after first considering and rejecting other site locations.

A radio frequency engineer, Benny Ghahramany, testified that the Fair Lawn site, which is located in the center of several other communications sites, is a "high priority site" for Smart's ESMR system. Failure to construct a mobile communications facility on the high priority site not only would deprive local residents of the use of Smart's ESMR system, but also would hinder inter-site communications. Inter-site communication is necessary to enable Smart to "hand off" a mobile user's telephone call to other sites as the user passes through the area. Ghahramany further explained that 140 feet is the minimum monopole height necessary to operate a mobile communications facility on the Fair Lawn site.

A land use planner, Carl Lindbloom, testified that Smart's proposed use constituted an "inherently beneficial use," as defined in *Sica v. Board of Adjustment,* 127 *N.J.* 152, 603 *A.*2d 30 (1992). Lindbloom asserted that the FCC's grant to Smart of a license to construct and operate an ESMR system demonstrated the public need for the service. He submitted a Memorandum Opinion and Order dated March 14, 1991, in which the FCC stated:

The Communications Act directs us to "[s]tudy new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more efficient use of radio in the public interest." Certainly, Fleet Call's [Smart's parent corporation] proposal falls squarely within the spirit of our statutory mandate.

According to Lindbloom, the proposed use would provide the public with a digital alternative to cellular telephones. Lindbloom noted that "typical users may include emergency services, police, fire, first aid and so forth, school buses, other bus manufacturers and trucking companies." He further concluded that the Fair Lawn site is particularly suited for the proposed use and was essential for Smart's ESMR system to be fully operational. The site, which is situated in a general industrial zone, is compatible with the permitted uses in that zone. Finally, Lindbloom testified that the ESMR monopole would produce no noise, vibrations, smoke, dust, odors, heat, or glare. Thus, the ESMR monopole

would not impose a significant impact on the environment. Because the ESMR monopole required only periodic maintenance, it would not affect motor vehicle traffic. Lindbloom concluded that the monopole's only negative aspect, its height, did not outweigh the benefits it conferred.

An electrical engineer, Louis G. Cornacchi, testified for Smart regarding electromagnetic field (EMF) radiation emissions. Cornacchi discussed the combined level of EMF radiation that the Smart and NYNEX antennas would emit. He posited a "worst case" scenario, in which he assumed Smart would operate all of its channels at maximum power for twenty-four hours a day. Based on that assumption, the nearest residential homes, some 400 feet from the area, would receive 2000 to 2500 times less EMF radiation than permitted under New Jersey law and 400 times less EMF radiation than permitted under the laws of those states with the strictest standards. According to Cornacchi, Smart's antennas would operate at only twenty to twenty-five percent of the levels used in his analysis. Thus, he concluded that the proposed use would emit EMF radiation levels beneath levels considered safe for human beings.

In response to the Board's concerns about long-term health effects, Smart introduced the testimony of Dr. Thomas Ely, a radiation safety expert. Dr. Ely testified that EMF radiation emissions from the ESMR monopole would fall far below safety levels set by the American National Standards Institute and the National Council on Radiation Protection. Residents would receive greater exposure to EMF radiation through one second of exposure to sunlight than through twenty-four hours of exposure to EMF radiation emitted from the ESMR monopole.

Smart's last witness was Robert Vance, a certified general real-estate appraiser, certified tax assessor, and licensed real estate broker in the State of New Jersey. Vance testified that construction of the ESMR monopole would not produce an adverse impact on real property values in Fair Lawn. In reaching that conclusion, Vance reviewed Smart's variance application, the site plan, Fair

Lawn's zoning ordinances, and neighborhood sales data. He performed an on-site inspection of the Fair Lawn site and the surrounding neighborhood. He also talked with the Fair Lawn tax assessor as well as other brokers and appraisers. Lastly, Vance reviewed a property-value study he had conducted in Warren Township, New Jersey, after a television station constructed a 396-foot communications tower in a residential neighborhood. In that study, Vance found that, despite its size and location, the tower had no impact on the real property values of the surrounding residential area.

Finally, in response to inquiries from the Board, Smart advised the Board that NYNEX and Smart were willing to co-locate their communication antennas on one 140–foot monopole. Smart proposed to tear-down NYNEX's existing 90–foot monopole and construct a new 140–foot monopole adjacent to the existing monopole's location. Thus, the number and location of monopoles in the area would remain unchanged.

Several Fair Lawn residents objected to Smart's application. Some residents feared that exposure to the proposed use's EMF radiation emissions would have a deleterious effect on their health. Others were displeased with the esthetics of a 140–foot tower. Still others were concerned that construction of the ESMR monopole would lower property values.

Angie Licasale, a licensed real estate agent, testified for the objectors that the ESMR monopole would cause an adverse effect on real property values. Licasale acknowledged, however, that she was not an appraiser, that she had never sold a house near a radio tower, that she had no personal experience with whether a radio tower affected real property values, and that she had not reviewed Smart's variance application. Nor had she reviewed any testimony in the matter nor seen any pictures of the Fair Lawn site. Lastly, she conceded that she had only a general knowledge of the Fair Lawn site.

Additionally, Dr. Elaine Winchell, chairperson of the Fair Lawn Environmental Commission, testified on behalf of area residents.

Dr. Winchell informed the Board that the Environmental Commission recommended the Board deny the variance on esthetic grounds.

On June 6, 1994, the Board denied Smart's application for a use variance. The Board found that the proposed use is not inherently beneficial because it "is a commercial venture for commercial users, bringing with it no improvement in the quality of life of the residents of the Borough of Fair Lawn but bringing with it the possibility that it can be used for illegal business transactions."

The Board further found that no special reasons existed for granting the use variance and that the "the proposed site is particularly inappropriate for the proposed monopole" because "the proposed use is on a narrow strip of industrially zoned property which abuts a residential area ... and ... the applicant failed to explore other sites which would be potentially appropriate for its use and would be within the area for the applicant to meet its technical ... requirements."

Finally, the Board concluded that the "use variance cannot be granted without substantial detriment to the public good and ... would substantially impair the intent and the purpose of the zone plan and ordinance." To support its conclusion, the Board found that the monopole was aesthetically displeasing to Fair Lawn residents. It also found that neighboring residents perceived that exposure to "signals being sent to and from [the] applicant's equipment on the monopole" would subject them to "illness over the long term." The residents also perceived that their property values would be diminished "by the aesthetically displeasing monopole and by future purchasers failing to bid on their homes due to the long term possibility of illness."

On August 12, 1994, Smart filed an action in lieu of prerogative writs, challenging the Board's decision. The Law Division affirmed that decision and dismissed Smart's complaint, holding that construction of the monopole constituted a commercial use, not an inherently beneficial use. In an unreported opinion, the Appellate

Division reversed, finding that the Board's decision was arbitrary, capricious, and unreasonable.

The Appellate Division concluded that the proposed monopole satisfied the positive criteria for obtaining a use variance. The court found that the monopole was both an inherently beneficial use and was particularly suited for the Fair Lawn site. In reaching the latter conclusion, it found that the site was a central location, that the I–2 zone's permitted uses were compatible with the monopole, and that the monopole would neither produce a significant impact on the environment nor require maintenance or municipal services.

The Appellate Division further found that the proposed use satisfied the negative criteria under *N.J.S.A.* 40:55D–70(d). Specifically, the court rejected the Board's conclusion that the monopole, which was merely 50 feet higher than the existing NYNEX monopole, would be aesthetically displeasing. Thus, the court concluded that the benefits from the monopole far outweighed any minimal detrimental impact on the zone. It also found nothing in the record to support the Board's conclusion that the public might be subject to long term illness from EMF emissions. Moreover, the court held that the Radiation Act preempted the Board's consideration of health effects caused by EMF radiation. Additionally, the court found "no evidence that the proposed use would be used for illegal business transactions." Lastly, the court found no basis for the Board's determination that construction of the ESMR monopole would lower property values.

## III.

Land use regulation is a synthesis of state statutes, municipal ordinances, and judicial decisions. Pursuant to Article 4, § 6, Paragraph 2 of the New Jersey Constitution and the MLUL, the legislature has delegated land use regulation to local municipalities. In particular, *N.J.S.A.* 40:55D–70(d) governs the applications for "use" or "d" variances. At the time of Smart's application, the statute provided:

The board of adjustment shall have the power to:

. . . .

d. In particular cases and for special reasons, grant a variance to allow . . . a use or principal structure in a district restricted against such use or principal structure.

. . . .

No variance or other relief may be granted under the terms of this section unless such variance or other relief may be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance. . . .

The statute thus requires an applicant to prove both positive and negative criteria to obtain a use variance. In general, the positive criteria require that an applicant establish "special reasons" for granting the variance. *Sica, supra,* 127 *N.J.* at 156, 603 *A.*2d 30. "The negative criteria require proof that the variance 'can be granted without substantial detriment to the public good' and that it 'will not substantially impair the intent and purpose of the zone plan and zoning ordinance.'" *Ibid.*

When interpreting the statute, we have distinguished inherently beneficial uses from other uses. Generally, to satisfy the positive criteria, an applicant must prove that "the use promotes the general welfare because the proposed site is particularly suitable for the proposed use." *Medici v. BPR Co.,* 107 *N.J.* 1, 4, 526 *A.*2d 109 (1987). To satisfy the negative criteria, in addition to proving that the variance can be granted "without substantial detriment to the public good," *id.* at 22 n. 12, 526 *A.*2d 109, an applicant must demonstrate through "an enhanced quality of proof . . . that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." *Id.* at 21, 526 *A.*2d 109.

If, however, the proposed use is inherently beneficial, an applicant's burden of proof is significantly lessened. An inherently beneficial use presumptively satisfies the positive criteria. *Burbridge v. Mine Hill Tp.,* 117 *N.J.* 376, 394, 568 *A.*2d 527 (1990). With an inherently beneficial use, moreover, satisfaction of the negative criteria does not depend on an enhanced quality of proof.

*Sica, supra,* 127 *N.J.* at 160–61, 603 *A.*2d 30. Instead, grant of the variance depends on balancing the positive and negative criteria. *Id.* at 163, 603 *A.*2d 30. When striking the balance:

First, the [the local land use] board should identify the public interest at stake. Some uses are more compelling than others.... Second, the Board should identify the detrimental effect that will ensue from the grant of the variance.... Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions.... Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.

[*Id.* at 165–66, 603 *A.*2d 30 (citations omitted).]

This procedure, "[w]hile properly making it more difficult for municipalities to exclude inherently beneficial uses ... permits such exclusion when the negative impact of the use is significant. It also preserves the right of the municipality to impose appropriate conditions upon such uses." *Id.* at 166, 603 *A.*2d 30 (citation omitted).

A recent amendment to section d of *N.J.S.A.* 40:55D–70 substantially codifies the *Sica* balancing test. *See Inherently Useless, N.J.L.J.,* Aug. 11, 1997, at 26 (editorial); William M. Cox, *Impact of New Law on "Inherently Beneficial" Uses, N.J. Planner,* July–Aug. 1997, at U–1. Effective June 30, 1997, section d now provides:

No variance or other relief may be granted under the terms of this section, *including a variance or other relief involving an inherently beneficial use, without a showing that* such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance....

[*L.* 1997, *c.* 145 (emphasis on new language).]

Thus, even when a proposed use inherently benefits the general welfare, the applicant still must prove that the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." In effect, the 1997 amendment serves as a reminder that even with an inherently beneficial use, an applicant must satisfy the negative criteria.

Other State and Federal statutes also affect municipal regulation of telecommunications facilities. The Radiation Act authorizes the New Jersey Commission on Radiation Protection "to formulate, adopt, promulgate, amend and repeal codes, rules and regulations as may be necessary to prohibit and prevent unnecessary radiation...." *N.J.S.A.* 26:2D–7. Additionally, the Radiation Act preempts local regulation of radiation emissions absent approval of the Commission on Radiation Protection. *N.J.S.A.* 26:2D–17.

Subsequent to the Board's consideration of Smart's application, moreover, Congress enacted the Telecommunications Act, which regulates, among other things, "mobile services" such as Smart's ESMR service. 47 *U.S.C.A.* § 332 (West Supp.1997). Although the Telecommunications Act recognizes the continuing role of State and local governments in regulating "the placement, construction, and modification of personal wireless service facilities," *id.* § 332(c)(7)(A), the Telecommunications Act limits that role. Specifically, the Telecommunications Act provides:

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

[*Id.* § 332(c)(7)(B).]

In certain respects, the Telecommunications Act's restrictions on the power of local land use agencies parallels restrictions already imposed under the MLUL and the Radiation Act. Like the Telecommunications Act, the MLUL requires that a municipal land use agency act on an application within a reasonable period of time, *see N.J.S.A.* 40:55D–73 (requiring board of adjustment to render decision no later than 120 days after submission of completed application), that the board memorialize its decision in writing, *N.J.S.A.* 40:55D–10(g), and that the agency's decision be supported by sufficient evidence in the record. *Rowatti v. Gonchar,* 101 *N.J.* 46, 51, 500 *A.*2d 381 (1985). Similarly, the Radiation Act, like the Telecommunications Act, preempts local regulation of EMF radiation emissions, so long as those emissions comply with applicable regulations. *L.I.M.A. Partners v. Borough of Northvale,* 219 *N.J.Super.* 512, 525, 530 *A.*2d 839 (App.Div.1987); *New Brunswick Cellular Tel. Co. v. Old Bridge Tp. Planning Bd.,* 270 *N.J.Super.* 122, 138–39, 636 *A.*2d 588 (Law Div.1993).

In other respects, however, the Telecommunications Act imposes greater limitations on local authority than does state law. State courts no longer provide the only avenue of relief for telecommunications carriers that have lost before local land use agencies. Under the Telecommunications Act, "Any person adversely affected by any final action or failure to act by a State or local government ... may ... commence an action in any court of competent jurisdiction." 47 *U.S.C.A.* § 332(c)(7)(B)(v). Thus, an unsuccessful applicant may challenge in a United States District Court final State or local governmental action that violates the Telecommunications Act. *See, e.g., Sprint Spectrum, L.P. v. Zon-*

*ing Hearing Bd.,* No. Civ. A. 97–1837, 1997 WL 688816 (E.D.Pa. Oct.15, 1997) (finding that court had jurisdiction to hear appeal from decision of zoning board denying application to construct and operate a "cell site" for wireless personal communications services); *Western PCS II Corp. v. Extraterritorial Zoning Auth.,* 957 F.Supp. 1230 (D.N.M.1997) (reversing denial of application to construct wireless carrier facility); *BellSouth Mobility, Inc. v. Gwinnett County, Ga.,* 944 *F.Supp.* 923 (1996) (reversing denial of application to construct cellular communications monopole). Additionally, although municipal boards may regulate the location of mobile communications facilities, they may not altogether prohibit them from being constructed within the municipality. *Id.* § 332(c)(7)(B)(i)(II). *See generally* Leon L. Knauer et al., *Telecommunications Act Handbook* (1996) (discussing effect of Telecommunications Act on the telecommunications industry).

## IV.

Judicial review of the decision of a Planning Board or Board of Adjustment ordinarily is limited. A board's decision "is presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable." *Sica, supra,* 127 *N.J.* at 166–67, 603 *A.*2d 30. In sum, courts will defer to a decision if it is supported by the record and is not so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion. *Kingwood Tp. Volunteer Fire Co. v. Board of Adjustment,* 272 *N.J.Super.* 498, 502–03, 640 *A.*2d 356 (Law Div.1993).

We begin our review with the Board's finding that Smart failed to prove the positive criteria necessary to grant a use variance. First, the Board found that the facility is not inherently beneficial because it "is a commercial venture for commercial users, bringing with it no improvement in the quality of life of the residents of the Borough of Fair Lawn but bringing with it the possibility that it can be used for illegal business transactions." Second, the Board contended that "the proposed site is particularly inappropriate for the proposed monopole."

The record, however, shows that Smart proved that its facility, including the monopole, is a necessary part of an increasingly essential public service. We are satisfied that Smart's proposed mobile communications facility serves the public interest. In approving Smart's application to construct an ESMR system, the FCC determined that Smart's ESMR system falls "squarely within" the spirit of its statutory mandate to "encourage the larger and more efficient use of radio in the public interest." Additionally, the Telecommunications Act indicates that it is in the public interest to promote competition among providers of commercial mobile services. 47 *U.S.C.A.* § 332(c)(1)(C).

Numerous decisions of the Law Division and Appellate Division have recognized that mobile communications facilities are inherently beneficial uses. *See, e.g., New Brunswick Cellular Tel. Co. v. Borough of South Plainfield Bd. of Adjustment,* 305 *N.J.Super.* 151, 166–67, 701 *A.2d* 1281 (App.Div. 1997) (finding proposed 90–foot steel monopole used to hold cellular antennas was inherently beneficial use); *Nynex Mobile Communications Co. v. Hazlet Tp. Zoning Bd. of Adjustment,* 276 *N.J.Super.* 598, 609, 648 *A.2d* 724 (App.Div.1994) (holding that cellular transmission antenna to be annexed to 130–foot water tower constituted inherently beneficial use); *New Brunswick Cellular Tel. Co., supra,* 1997 WL 800364, at *2–3 (finding cellular communications facility inherently beneficial); *New Brunswick Cellular Tel. Co. v. Township of Edison Zoning Bd. of Adjustment,* 300 *N.J.Super.,* 456, 469–71, 693 A.2d 180 (Law Div.1997) (finding proposed 80–foot monopole used to hold cellular antennas was inherently beneficial); *Kingwood, supra,* 272 *N.J.Super.* at 503–06, 640 *A.2d* 356 (determining that 197–foot cellular telecommunications tower was inherently beneficial use); *Old Bridge, supra,* 270 *N.J.Super.* at 137–38, 636 *A.2d* 588 (concluding that 160-foot cellular radio transmission tower constituted inherently beneficial use). *See also* Alan B. Zublatt, *The Telecommunications Act of 1996, N.J. Planner,* Dec. 1977, at 4 (discussing impact of Telecommunications Act on municipal zoning and planning boards). Although none of those cases involved applications to construct a mobile communications facility

providing digital ESMR services, we find no reason to distinguish between mobile communications facilities providing cellular services and those providing digital services. *See* 47 *U.S.C.A.* § 332(d) (indicating that all for-profit mobile services should be treated similarly as "commercial mobile services").

■ At some point, we too might recognize, as the lower courts unanimously have recognized, that the proposed mobile communications facility is an inherently beneficial use. For several reasons, however, we are reluctant to so recognize such a facility at this time.

■ First, the proposed facility will be used strictly for commercial purposes. Admittedly, the commercial nature of a proposed use, alone, is not dispositive of its status for zoning purposes. Some profit making ventures may achieve inherently beneficial status. *Sica, supra,* 127 *N.J.* at 159, 603 *A.*2d 30. Unlike "the typical commercial use" that acts merely "as a convenience to its patrons," *Medici, supra,* 107 *N.J.* at 18, 526 *A.*2d 109, the inherently beneficial commercial use, by its very nature, serves the general welfare. *Sica, supra,* 127 *N.J.* at 160, 603 *A.*2d 30. Nonetheless, the commercial nature of a venture remains a factor to consider.

Second, inherently beneficial uses are generally limited in number within a single municipality. Examples include the unique head trauma center in *Sica*, the telephone switching station in *Yahnel,* the 120 bed nursing home in *Urban Farms, Inc. v. Borough of Franklin Lakes,* 179 *N.J.Super.* 203, 431 *A.*2d 163 (App.Div.), *certif. denied,* 87 *N.J.* 428, 434 *A.*2d 1099 (1981), the tertiary sewerage treatment plant in *Wickatunk Village, Inc. v. Township of Marlboro,* 118 *N.J.Super.* 445, 288 *A.*2d 308 (Ch. Div.1972), and the private hospital for the emotionally disturbed in *Kunzler v. Hoffman,* 48 *N.J.* 277, 225 *A.*2d 321 (1966). Here, Smart is the second company seeking to locate a mobile communications facility in Fair Lawn. In the future, other companies may also seek to locate a mobile communications facility in the area.

The record does not disclose how many mobile communications facilities exist in New Jersey or where they are located. Furthermore, the record is devoid of information showing how many more mobile communications facilities are needed throughout the state. The absence of relevant information leaves a concern about the extent to which an undefined number of carriers will seek to install an unknown number of telecommunication facilities at undesignated locations throughout the state.

Compounding that lack of information is the competitive nature of the telecommunications industry. A major goal of the Telecommunications Act is to promote increased competition in the telecommunications industry. More companies may seek to enter the market, thereby necessitating the construction of additional mobile communications facilities.

Third, unlike many inherently beneficial uses, mobile communications facilities are essentially exempt from regulation by state government. Based on the record before us, providers of mobile communications services need not obtain a certificate of need from any State department. *Compare New York SMSA Ltd. Partnership v. East Hanover Tp.*, 13 *N.J. Tax* 564, 570 (1994) (recognizing that Board of Public Utilities has determined that, under existing statutes, it has no jurisdiction over Cellular Radio Telecommunications Services), *with Sica, supra,* 127 *N.J.* at 156, 603 *A.*2d 30 (indicating that New Jersey Department of Health issued certificate of need for proposed head-trauma center), *Lazovitz, supra,* 213 *N.J.Super.* at 378, 517 *A.*2d 486 (recognizing that applicant held certificate of necessity to construct nursing home), *and Urban Farms, supra,* 179 *N.J.Super.* at 209, 431 *A.*2d 163 (same). Given the essentially unregulated competition in the telecommunications industry, we doubt that either Congress or the State Legislature intended that carriers should have a free hand in placing towers and monopoles wherever they please.

A fourth consideration arises from the fact that Smart's proposed communications facility includes a 140–foot monopole. In some parts of the state, carriers have located towers that are

several hundred feet high. The result is that towers and monopoles are often vastly higher than other structures in the municipality, particularly those in residential zones. Because of their size and height, radio transmission towers and monopoles can be a cause of concern. *See, e.g., Borough of South Plainfield, supra,* 305 *N.J.Super.* at 169–71, 701 *A.*2d 1281 (finding reasonable board's conclusion that 90–foot monopole impaired zone plan); *see also Lazovitz v. Board of Adjustment,* 213 *N.J.Super.* 376, 380–381, 517 *A.*2d 486 (App.Div.1986) (holding board did not abuse its discretion in concluding, among other things, that height and visibility of proposed four story nursing home impaired residential character of neighborhood).

A mobile communications facility, which requires construction of a tower or monopole, is not suitable for every site. Although such facilities may promote the general welfare, towers and monopoles can pose special land use problems. A structure that exceeds permitted bulk requirements, particularly those pertaining to height, may be more appropriate in one zone than another or in one area of a zone than another. It is not that towers or monopoles universally are aesthetically displeasing. Nor is it that they necessarily impose an adverse effect on surrounding properties or a municipal land use plan. The point is that some sites are better suited than others for towers or monopoles. In sum, whether or not a radio transmission tower or monopole will substantially impair the character of a neighborhood will depend on the circumstances of each case.

Because of the preceding concerns, we believe the better judgment is not to declare communications facilities that require construction of towers or monopoles to be inherently beneficial uses. Although the issue is not before us, we might reach a different result with a facility that does not require a tower or monopole, such as one that simply involves appending antennas to an existing structure.

To resolve the present appeal, moreover, we need not declare such facilities to be inherently beneficial uses. A commer-

cial use serves the general welfare and thereby satisfies the positive criteria if the use is particularly suited for the proposed site. *Medici, supra,* 107 *N.J.* at 4, 526 *A.*2d 109; *Kohl v. Mayor & Council,* 50 *N.J.* 268, 279, 234 *A.*2d 385 (1967). Relevant to the determination of the suitability of a telecommunications site is the Telecommunications Act's mandate that "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 *U.S.C.A.* § 332(c)(7)(B)(i)(II). Here, the site is zoned for industrial use, is centrally located within Smart's ESMR system, and already accommodates the existing 90–foot NYNEX monopole. Thus, Smart has proved that its mobile telecommunications facility serves the general welfare and satisfies the positive criteria.

## V.

Our conclusion that Smart's facility satisfies the positive criteria under *N.J.S.A.* 40:55D–70(d), however, does not end our inquiry. We must still ascertain whether Smart has satisfied the negative criteria. In making this determination, we will weigh, as we would with an inherently beneficial use, "the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." *Sica, supra,* 127 *N.J.* at 166, 603 *A.*2d 30. We conclude that Smart has established that the requested variance may be granted without substantial detriment to the public good.

A telecommunications facility is a paradigm for a use that serves a greater community than the particular municipality. Here, for example, the telecommunications facility will provide Fair Lawn residents, as well as mobile users traveling through the municipality, with the ability to access Smart's digital ESMR system. The uncontradicted evidence is that the ESMR system offers services not available through cellular systems. To that extent, the ESMR system will further the congressional goal of

competition among providers of commercial mobile services. Additionally, the general public, commercial entities, as well as fire, police, and other rescue personnel can use the digital ESMR system.

 The proposed use, moreover, will not substantially impair Fair Lawn's zone plan or zoning ordinance. Compelling evidence supports the conclusion that the Fair Lawn site is particularly suited for the proposed use. Additionally, any detrimental effects resulting from the grant of the variance will be minimal. Nothing in the record permits a contrary conclusion. The proposed use will produce no noise, vibrations, smoke, dust, odors, heat, or glare. It would require infrequent maintenance and little or no municipal services such as water, sewer, police or fire.

On the record before us, the proposed ESMR monopole would not substantially impair Fair Lawn's zone plan. Although the Fair Lawn site abuts a residential zone, the site is still zoned for industrial use and is surrounded on three sides by commercial and industrial uses. Because Smart and NYNEX offered to take down NYNEX's existing 90–foot monopole and to co-locate their antennas on one 140–foot monopole, the proposed use would result in merely a 50–foot increase in height. That increase would not substantially alter the Fair Lawn skyline. *See Nynex, supra,* 276 *N.J.Super.* at 612, 648 *A.*2d 724 (finding addition of 8 to 10 feet of antenna on top of existing 130–foot water tower was "aesthetically inconsequential and minimal intensification of the nonconformity"); *Kingwood, supra,* 272 *N.J.Super.* at 509, 640 *A.*2d 356 (holding that replacement of 75–foot tower with 197–foot tower would impose, at most, minimal intrusion on surrounding community).

 In light of state and congressional legislation, the Board exceeded its authority in giving credence to the perception of neighbors that EMF radiation emissions may cause long-term health effects. At the time when the Board heard Smart's application, the Radiation Act already preempted the Board's consideration of EMF radiation emissions that fell within applicable government safety standards. *L.I.M.A. Partners, supra,* 219

*N.J.Super.* at 525, 530 *A.2d* 839; *Old Bridge, supra,* 270 *N.J.Super.* at 138–39, 636 *A.2d* 588. Since the Board rendered its decision, the Telecommunications Act likewise has preempted local consideration of EMF radiation emissions. 47 *U.S.C.A.* § 332(c)(7)(B)(iv). Here, moreover, Smart introduced uncontroverted evidence that nearby residents, at most, would receive 2000 to 2500 times less radiation than permitted under New Jersey law and 400 times less radiation than permitted under the laws of the states with the strictest emission standards.

Finally, nothing in the record supports the Board's conclusion that the proposed use would adversely affect property values. The only testimony concerning the proposed use's adverse effect on property values came from nearby residents, who feared the ESMR monopole would make it harder to sell their homes, and from a local real estate agent, who thought that the ESMR monopole would lower property values. We agree with the Appellate Division that the real estate agent's testimony was tantamount to a net opinion. Much more persuasive was the testimony of Smart's appraiser who testified that the ESMR monopole would have no adverse impact on nearby real estate values.

## VI.

In sum, we conclude that Smart is entitled to the grant of a variance to construct a communications facility with a 140–foot monopole for the joint use of Smart and NYNEX at the Fair Lawn site. The proposed use satisfies both the positive and negative criteria for a use variance.

We note that in the present case, as in the other reported opinions, local land use agencies were placed in the posture of reacting to an applicant's choice of location for a telecommunications facility. The Telecommunications Act now requires that local governments not prohibit or have the effect of prohibiting, the placement, construction, or modification of mobile communication facilities within their borders. Perhaps because of that requirement, some municipalities have adopted ordinances identi-

fying zones in which telecommunications facilities may be located. *See, e.g., Town Ordinance Gives Communities Basis to Follow on Cellular Towers, Westfield Leader,* Dec. 18, 1997, at 4; W.P. Henning, *Tower Ordinance to Boost Rumson's Options, Two River Times,* Dec. 12, 1997, at 1, 12. Fair Lawn likewise has amended its ordinance to provide a site for telecommunications towers. Whether such ordinances comply with federal or state law is another issue for another day.

Other municipalities likewise have taken steps to conceal antennas. So called "stealth towers" have been constructed to look like a bell tower, *"Towering" 1997 Achievement, Observer Tribune,* Jan. 1, 1998, at 3, a 100–foot–tall pine tree, or a wind mill, Andrew C. Revkin, *It's a Tree! It's a Cactus, N.Y. Times,* Jan. 11, 1998, at 21. Some carriers have attached antennas to existing structures such as buildings or water towers. *Id.* at 25; *Sellitto v. Borough of Spring Lake Heights,* 284 *N.J.Super.* 277, 280, 664 *A.*2d 1284 (App.Div.1995), *certif. denied,* 143 *N.J.* 324, 670 *A.*2d 1065 (1996); *Nynex, supra,* 276 *N.J.Super.* at 600, 648 *A.*2d 724. Enterprising churches have executed leases for the installation of antennas on church steeples. Jon G. Auerbach, *Holy Toll Calls: Telecom Companies Now Turn to Heaven, Wall St. J.,* Dec. 23, 1997, at 1.

The development of a wireless system that does not adversely affect surrounding property calls for cooperation between carriers and land use regulators. We anticipate that carriers will continue to seek sites for telecommunications facilities. Across the country, antennas will continue to grow to accommodate an increasing number of subscribers. *See* Revkin, *supra,* at 21 (estimating an increase of 30,000 new subscribers per day).

At the beginning of the twentieth century, telephone and telegraph carriers dotted the landscape with poles to support the wires that were essential for telecommunications. As the century comes to an end, society is making the transition from wired to wireless communications. Eventually, towers and monopoles, like the telephone poles of the past, may become an accepted part of the scene. At some time, moreover, Congress or the State

Legislature may declare that local land use agencies have no role in deciding the location of wireless telecommunications facilities. For the present, we believe it is more consistent with the existing federal and state statutes to recognize a harmonious role for local land use agencies in the location of those facilities. That recognition should permit telecommunications carriers to erect needed telecommunications facilities on suitable sites.

To guide local land use agencies and the lower courts in deciding cases involving the location of such facilities, we offer the following further guidelines. Generally, the issuance of an FCC license should suffice for a carrier to establish that the use serves the general welfare. Nonetheless, if a telecommunications facility requires construction of a tower or monopole, the applicant must prove that the site is particularly suited for that use. Concerning the negative criteria, the Radiation Act and the Telecommunications Act have virtually preempted local consideration of radiation emissions. Proof of an adverse effect on adjacent properties and on the municipal land use plan, moreover, generally will require qualified expert testimony. Bare allegations that the construction of a tower or monopole will cause a decline in property values rarely will suffice. Our goal in making these suggestions is to facilitate the decision of cases involving the location of telecommunications facilities with an appropriate regard for both the need and location of those facilities.

The judgment of the Appellate Division is affirmed as modified.

*For modification and affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.