**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1010-19

KENSINGTON SENIOR
DEVELOPMENT, LLC,

      Plaintiff-Appellant,

v.

THE TOWNSHIP OF VERONA
AND THE ZONING BOARD OF
ADJUSTMENT OF THE
TOWNSHIP OF VERONA,

      Defendants-Respondents.

_____

> Argued October 21, 2020 – Decided December 1, 2021
>
> Before Judges Fuentes, Whipple, and Rose.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-1710-19.
>
> Paul H. Schneider argued the cause for appellant (Giordano, Halleran & Ciesla, PC and Connell Foley LLP, attorneys for appellant; Paul H. Schneider, Matthew N. Fiorovanti, and Robert L. Podvey, on the briefs).

Mark J. Semeraro argued the cause for respondents (Kaufman, Semeraro & Leibman, LLP, attorneys for respondents; R. Scott Fahrney, and Mark J. Semeraro, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Plaintiff Kensington Senior Development, LLC (Kensington), appeals from the final judgment of the Law Division dismissing its action in lieu of prerogative writs filed pursuant to Rule 4:69-6(b)(3) and upholding the decision of the Zoning Board of Adjustment of the Township of Verona (Board) to deny Kensington's application for preliminary and major site plan approval and a use variance to construct a ninety-two-unit assisted living facility with related site improvements. The application also required demolition of the existing building and continuation of the parking lot as a preexisting nonconforming use.

Kensington argues the Law Division erred as a matter of law because the Board failed to properly apply the four-factor balancing test established by the Supreme Court in Sica v. Bd. of Adjustment, 127 N.J. 152 (1992). Kensington argues the misapplication of these legal factors rendered the Board's decision to deny its application arbitrary, capricious, and unreasonable. The Board argues the lengthy resolution it adopted on February 14, 2019, shows it thoroughly evaluated the merits of plaintiff's application and properly applied the Sica

2

balancing test. The Township of Verona urges this court not to consider plaintiff's untimely and unsubstantiated arguments attacking the constitutionality of its municipal zoning ordinance, an issue plaintiff concedes was not raised before the Law Division. After reviewing the record developed before the Law Division and mindful of our standard of review, we affirm.

I.

Kensington is the contract purchaser of two properties located on Bloomfield Avenue in Verona. One property is located in the Town Center Zone District (TC); the other is on Claremont Avenue, which is zoned in the A1 Zone District (Multi-Family Low Rise). Kensington's application proposed to demolish the building located on Bloomfield Avenue, which was used as a banquet hall, and construct a three-story, ninety-two-unit assisted living facility with underground parking. The Claremont Avenue property would provide accessory parking to the assisted living facility. Because the Claremont Avenue property was already used as an accessory parking lot for the banquet hall, its continued use for this purpose constituted a preexisting nonconforming use. Kensington's application to the Board sought the following variances:

> (1) Use variance pursuant to N.J.S.A. 40:55D-70(d)(1), to construct and operate an assisted living facility, which is not permitted under Section 150-17.14 of the Verona Zoning Ordinances.

(2) Use variance pursuant to N.J.S.A. 40:55D70(d)(1), to operate and maintain an off-site accessory parking lot associated with the assisted living facility.

(3) Bulk variance pursuant to N.J.S.A. 40:55D-70(c) for locating parking spaces within or underneath the principal building in a non-residential zoning district, which is not permitted under Section 150-12.1.B.2 of the Verona Zoning Ordinances.

(4) Bulk variance pursuant to N.J.S.A. 40:55D-70(c) for minimum requirements for the size of an off-street parking space at the Claremont Avenue Lot, which is not permitted under Section 150-12.2.A of the Verona Zoning Ordinances.

(5) Bulk variance pursuant to N.J.S.A. 40:55D-70(c) for minimum number of required driveways at the Claremont Avenue Lot, which is not permitted under Section 150-12.8.C.2 of the Verona Zoning Ordinances; and

(6) Bulk Variance pursuant to N.J.S.A. 40:55D-70(c) for minimum drive aisle width for a two-way driveway at the Claremont Avenue Lot, which is not permitted under Section 150-12.8.C.3(a) of the Verona Zoning Ordinances.

In addition to these zoning restrictions and bulk requirements, plaintiff's proposal was directly at odds with how Verona envisioned the area in its Master Plan:

> The land use concept for the Central Business District (CBD) or [TC] is to protect the integrity of existing retail and business development at a pedestrian scale. In order to meet this objective, the Township should continue to support the district with public parking facilities, and the zoning ordinance should be modified to limit office and residential uses to those locations other than at street level. This district promotes retail

4

> development, with a first[-]floor use restriction applying to all offices except travel agencies, brokerage firms, real estate offices and opticians since these office uses often attract drop-in trade. These office uses also offer the potential for attractive window displays and attract pedestrian interest . . . in store-to-store shopping. The placement of drive-thru facilities of any kind within this district detracts from a pedestrian-oriented district and should not be permitted.

Consistent with this vision, Verona Zoning Ordinance Section 150-I 7.14 permits only businesses such as retail stores, retail service establishments -- including stores, shops, and other retail businesses that operate within the confines of a commercial building -- restaurants, bakeries, and nonalcoholic beverage bars.

## II.

### A

In support of its application, Kensington presented the testimony of the following witnesses: (1) Kensington Representative Michael Rafeedie; (2) Architect Paul Sionas, A.I.A.; (3) Engineer Michael Petry, P.E.; (4) Traffic Engineer Andy Jafolla, P.T.O.E.; and (5) Professional Planner Kathryn M. Gregory, P.P., A.I.C.P.

Rafeedie explained the proposed plan for the Bloomfield Avenue property involved demolishing the existing banquet hall and constructing a three-story,

5

ninety-two-unit assisted living facility with approximately 85,000 square feet of lot coverage and an underground parking area to accommodate fifty-five parking spaces. Fifty-four additional parking spaces would be available in the accessory parking lot on the Claremont Avenue property.

When asked why Kensington decided to build this facility in Verona, Rafeedie testified this municipality did not have any property dedicated to serve the needs of residents who have difficulty performing daily activities due to age or physical disabilities. To find facilities that met their needs, these Verona residents' closest options would be relocate to Fairfield, West Caldwell, or West Orange. Rafeedie continued:

> It's our belief that everyone regardless of age should be able to live and thrive in the town in which they want and more importantly as folks get older they should be able to live and thrive in the community in which they helped build and create and contribute to for all the years that they live in that community.

Rafeedie described the Bloomfield Avenue property as an ideal location for the proposed assisted living facility because "our experience shows that seniors want to remain downtown in the urban environments near where they did live and shop and dine and go for entertainment for all those years near walkable amenities." Rafeedie also claimed an assisted living facility was economically compatible with the business zoning district. He testified that, on

6

average, Kensington properties spend nearly one million dollars in the local community. However, at a Board hearing held on August 9, 2018, a member of the public asked him to identify the authoritative source he relied on to support his claim. Rafeedie was unable to provide any competent evidence.

Based on the experience derived from other Kensington-owned assisted living facilities, Rafeedie anticipated the Bloomfield Avenue location would receive between 15,000 to 20,000 visitors per year. He described it as a "destination for family and friends depending on the size of the property . . . ." He also estimated the facility would create "over [one hundred] well paying full-time jobs." Employees of the facility would be assigned to three separate shifts. The morning and evening shift would have approximately forty to forty-five staff members. The morning shift would be from 7:00 a.m. to 3:00 p.m.; the evening shift would be from 3:00 p.m. to 11:00 p.m.; and the overnight shift would be from 11:00 p.m. to 7:00 a.m. The overnight shift would ordinarily require less personnel. The Board was concerned about the potential traffic congestion during employee shift changes. In response, Rafeedie claimed it was unlikely the staff would arrive exactly at the end of each shift. "The residents' needs and the building's needs drive the employee staffing."

A-1010-19

Finally, Rafeedie explained how they planned to remove the waste generated by the facility's operation.  Based on their experience from other Kensington assisted living facilities, they anticipated:  (1) garbage pick-ups would occur four to five times per week; (2) recycling pick-ups would occur two to three times per week; (3) produce deliveries would occur three to six times per week; and (4) dry food and bread delivery would occur two to three times per week.  Based on statistics gathered from the five other Kensington assisted living facilities, they projected an average of seven to eight ambulance calls per month.  Rafeedie assured the Board that Kensington would contract to provide its own ambulance service.

B.

Kensington presented the testimony of several witnesses whom the Board accepted as experts in their field.  Engineer J. Michael Petry began his presentation by describing the typography and condition of the Bloomfield Avenue and Claremont Avenue properties.  He explained how the facility would integrate within the exiting community.  He described "the proposed vehicular ingress and egress" from the Bloomfield Avenue property and expected that "[a]ll vehicles exiting the . . . Bloomfield Avenue parking garage beneath the assisted living facility would have to exit the site onto Claremont Avenue."  We

8

incorporate by reference the Board's findings derived from Petry's testimony as described in its February 14, 2019 resolution, paragraphs numbered twenty-eight to thirty-seven.

Kensington's counsel next presented the testimony of Traffic Engineer Andrew Jafolla, who addressed the impact the assisted living facility would have on existing traffic patterns. Jafolla described the results of a traffic study he completed on the Bloomfield Avenue property on Friday, July 12, 2018, from 6:00 p.m. to 7:00 p.m. The banquet hall was booked for a social event that day and expected 245 guests. The Board found the guests who attended this event were required to enter through the Bloomfield Avenue entrance and "utilize the valet service offered." The Board's finding in this respect, however, is not entirely consistent with Jafolla's testimony, who actually stated:

> [T]he count[] we took was really just the people that utilized the driveway. Most of the people that would use the driveway would use the valet. They weren't required to do so, but for the most part they did use it. And what that ends up doing is creating a stack out onto Bloomfield Avenue . . . .
>
> [(Emphasis added).]

This created a backup of vehicles onto Bloomfield Avenue as sixty-four cars attempted to enter the banquet hall's parking area. The banquet hall has a maximum occupancy capacity of 475 people. Because only 245 guests were

expected, Jafolla made clear his study did not consider traffic conditions at the banquet hall's peak occupancy capacity.

Jafolla testified the main source of traffic generated by an assisted living facility would be from employees and visitors. Based on data compiled by the Institute of Transportation Engineers (ITE) and made available in its Trip Generation Manual (TGM), Jafolla anticipated the facility would generate twenty-five total trips during the morning rush hour, thirty-four total trips during the afternoon rush hour, and thirty-five total trips during peak hours on Saturdays. Although the TGM did not compile trip generation data for banquet halls, he relied on data from the New Jersey Department of Transportation Highway Access Permitting System (HAPS) to determine an anticipated trip generation for the banquet hall at its full capacity of 475 people. Based on this data, Jafolla opined the banquet hall generates seventy-six total trips during the morning rush hour, 143 total trips during the afternoon rush hour, and 157 total trips during the Saturday rush hour.

According to Jafolla, the daily trip generation for the banquet hall at full capacity of 475 people was 1,359; the daily trip generation for the proposed assisted living facility was 500. Based on these data, the impact on traffic of the proposed assisted living facility would be minimal compared to the vehicular

10

activity generated by the banquet hall. This prompted the following exchange

between a Board member and Jafolla:

> [BOARD MEMBER]: So peak hours does that take into account, so like, in Verona we have a middle school right up the street in the center of our town and there is a variety of elementary schools off, in areas off of Bloomfield Avenue. So, I'm interested in finding out how the additional traffic is going to impact what I consider to be our peak traffic hour here which would be school drop-offs and [school] pick-ups, so around 3:00, 3:30, 2:45. Would you have any, did you do any analysis with respect to how the traffic will impact those times?
>
> JAFOLLA: Well, the traffic that is going to happen there is going to be less than the peak hours that I just mentioned. So, the impacts that are going to be happening on the peak hours are minimal, are very small. Right? They are really in my opinion there is no material impact of this traffic. The traffic that is going to occur during the other hours which would include the school piece associated with this site is going to be even less, so it would be even less than those peak hours. So again, I would say those impacts are going to be minimized.

Based on the anticipated trip numbers Jafolla produced, a member of the

public expressed the following concerns about the potential increase in traffic:

> PUBLIC MEMBER: Just a question, so I think I heard you say there was about 500 trips that would be happening a day. Obviously for those who are exiting on Bloomfield you can't make a left so I would have to assume that there would be a fair number of trips that would be happening coming off of the Claremont exit?

11

JAFOLLA:  Well, all trips would have to use Claremont because you would not be able to exit to Bloomfield from this site.  You would only be able to come into the site from Bloomfield.

PUBLIC MEMBER:  Would there be 500 trips on Claremont a day?

JAFOLLA:  Yes.

Another member of the public questioned the credibility of the anticipated trip numbers:

PUBLIC MEMBER:  I live a door away from [the banquet hall].  And they have an average of one affair a week.  And I doubt very much that they have 1,300 trips going in and out of that place.  If they did they wouldn't be selling the property.  But, and it's an average of once a week, so I don't know how you figure that that will be less traffic when it's 3,500 and if they did have 1,300 one day a week how that's less traffic?  I don't know how that's figured.

JAFOLLA:  Well, again the daily traffic is something I provided because the [B]oard asked.  As far as traffic impact goes and what the general public feels, it's standard practice that you don't really use the daily traffic to evaluate that.  You utilize the peak hour traffic flow.  That's what the public feels when they utilize the roadway system.  They feel the peak hour.  They feel that hour that they are coming home in the evening.  They feel that hour that they are going to work in the morning.

A-1010-19

After the concerns expressed by the Board and members of the public, Jafolla returned to testify at a hearing held on October 25, 2018, to discuss data gathered from a traffic analysis completed on Wednesday, September 12, 2018, from 7:00 a.m. to 9:00 a.m. and 2:30 p.m. to 6:00 p.m. and on Saturday, September 15, 2018, from 11:00 a.m. to 2:00 p.m. Jafolla explained, "we basically created a box around the site . . . [and covered] more or less" the following five corners: (1) Bloomfield Avenue and Park Avenue, (2) Bloomfield Avenue and Verona Place, (3) Bloomfield Avenue and Cumberland Avenue, (4) Claremont Avenue and Cumberland Avenue, and (5) Claremont Avenue and Park Avenue.

This new traffic study was also conducted to clear up any misconception Jafolla may had unintentionally implied about the banquet facility during his previous testimony:

> The testimony provided last time was a comparison of the trip generation of the banquet facility when it's operating at a capacity of 475 people, as compared to an assisted living facility on an everyday basis.
>
> . . . I just want to clarify that. There was a comment letter that was issued to the [B]oard and I think a lot of those comments had to do with that misinterpretation. My testimony last meeting did mention that, but I just want to be clear with that and upfront that that is, you know, that was my testimony at the last meeting.

A-1010-19

According to Jafolla, between 3:00 p.m. to 3:15 p.m., "almost all of the pedestrian traffic along Claremont Avenue consisted of students[,] which passed the proposed driveway for the Claremont Avenue property." Outside of this fifteen-minute period, "there was very little pedestrian traffic noted on Claremont Avenue."[1] Jafolla also addressed the safety concerns associated with vehicles making left turns to enter the Bloomfield Avenue property. Jafolla claimed once the assisted living facility is operational, only six vehicles per hour were expected to make left turns.

Once again relying on the TGM, which presumes an assisted living facility licensed by the State of New Jersey to have 130 beds, which is also the number of beds proposed by the applicant, Jafolla opined it was reasonable to anticipate twenty-five total trips during the morning rush hour, thirty-four total trips during the afternoon rush hour, and thirty-five total trips during the Saturday peak hour.

Jafolla used data from HAPS to determine an anticipated trip generation for the banquet hall at its full capacity of 475 people. Based on these data, Jafolla claimed the banquet hall generates seventy-six total trips during the

[1] Although the Board Chairperson inquired about the possibility of the applicant creating a crosswalk on Claremont Avenue, the Board's attorney made clear that was "the township's responsibility. We can only make a recommendation. The governing body would make the ultimate decision as to whether or not a crosswalk could be installed."

A-1010-19

morning rush hour, 143 total trips during the afternoon rush hour, and 157 total trips during the Saturday rush hour. Jafolla calculated the daily trip generation for the banquet hall at full capacity to be 1,359; the estimated weekday trip generation for the proposed assisted living facility was 500. Thus, he claimed the impact on traffic of the proposed assisted living facility would be minimal in comparison to the property's current use as a banquet hall.

C.

Professional Planner Kathryn M. Gregory testified as an expert witness at the hearing held on October 11, 2018. Gregory began her presentation before the Board by asserting that Verona "technically" does not permit assisted living facilities "anywhere in [its] zoning ordinance." She thereafter immediately qualified her blanket assertion by acknowledging the zoning ordinance expressly authorizes age-restricted housing and assisted living facilities in redevelopment district four. Gregory also noted

> there's been discussions before about inherently beneficial. There is some case law that is associated with inherently beneficial uses and it has been found that assisted living facilities are indeed inherently beneficial.
>
> And that was in the Sun Rise Development [v.] the Zoning Board of Adjustment of the Borough of

A-1010-19

Madison.[2]  It was found that housing for the elderly is an inherently beneficial use of high priority.  Assisted living facilities including those operated for profit are to be treated as inherently beneficial uses.

Gregory described how, in her view, the applicant proved the positive and negative criteria codified by the Legislature in N.J.S.A. 40:55D-70(d) and clarified under the four-prong test established by the Supreme Court in Sica. She opined the proposed assisted living facility was inherently a beneficial use because it would serve "a special needs population" and be the only one of its kind in Verona.  The next step is to determine the negative criteria.  This requires the Board to assess the effect the proposed use would have on the surrounding properties and evaluate and determine whether it will damage the character of the neighborhood or undermine the municipality's growth policy reflected in its master plan, thus constituting a "substantial detriment to the public good."  Sica, 127 N.J. at 163 (quoting Medici v. BPR Co., 107 N.J. 1, 22 n.12 (1987)).

Addressing this standard, Gregory provided the following testimony:

While I venture to say that I don't think that there [are] any detrimental effects from the granting of the use

---

[2]  The case cited by Gregory is a July 1999 unpublished opinion by this court which has no precedential value as a matter of law.  R. 1:36-3.  As a Professional Planner, Gregory is not expected to be familiar with our Court Rules.  However, she is also not authorized to testify about legal matters beyond the scope of her competency and more akin to the practice of law.

variance from the assisted living facility in this location, I think that the building itself meets the intent of the town center zone and I think that has a lot to do with addressing the street scape.

. . . [T]he use there today does not address the street scape. It does not really advance what the town center I think is envisioned to be. That is the walk of the street, eyes on the street, you don't have any of that with the building. You have a bunch of cars coming to the site for one event and then they are leaving. They are not, people are not coming to the site and then deciding to walk around town and take advantage of the other opportunities that might be in there in terms of restaurants and shops etc.

So I think that the architecture of the building and the fact we do have entrances on the street, I believe that we also meet the intent because there will be less traffic generated than the current use. I also believe that in terms of the noise factor as you know now what we have is a catering hall and it's really a high demand -- excuse me, of traffic that happens late at night because people are all leaving the facility at the same time. So that's a lot louder than if you have people that are actually living in an assisted living facility because usually at night it's pretty [quiet]. Usually the residents are already in bed at a much earlier hour. So I think that that actually helps the character of the neighborhood in terms of the noise impact because you do have a lot of residential neighbors . . . .

The third prong under Sica addresses the Board's power to consider reducing any detrimental effects by imposing reasonable conditions on the use. Gregory noted the Board's concern "about school children and maybe the traffic

17

during that period . . . ." Although she opined this was "not an issue," she testified "the applicant is more than willing to put up traffic signs and/or alter shifts or whatever, you know, we need to do <u>to appease any potential detrimental effects</u>.  Although I don't believe there really are any."  (Emphasis added).

The fourth prong requires weighing the positive and negative criteria. Gregory opined "the proposed development and use would promote the public, health, safety, and general welfare, [and] promote appropriate use of the property to ensure adequate light, air, and open space and would provide an appropriate location for a necessary use to meet the needs of Verona residents." She did not find any basis to conclude the project would be a substantial detriment to the public or to Verona's Master Zoning Plan.  In this context, a member of the Board asked Gregory whether the assisted living facility's effects on traffic could be consider a substantial detriment because "it's going to have the traffic there during the day when Bloomfield Avenue is a lot busier." Gregory agreed the assisted living facility would generate more traffic during the day.  However, she claimed "it's not going to be such a concentrated amount of traffic."

A-1010-19

III.

The record reflects the members of the Board took their responsibility seriously, conducted themselves mindful of their civic duty, and heeded the legal standards applicable to this case as explained to them by their attorney. On January 10, 2019, the members of the Board heard the comments of residents of Verona, as well as from any member of the general public. The Board then publicly deliberated the issues raised by the Kensington's project and, by a vote of four to three, rejected the application.

On February 14, 2019, the Board adopted a comprehensive resolution memorializing the testimonial evidence presented by the witnesses, the comments received from the public, and the factual findings and legal conclusions it reached based thereon.[3] The Board made the following legal and general conclusions:

> (1) The proposed assisted living facility would violate the provisions of the Verona Zoning Ordinance;
>
> (2) No evidence of regional need was presented by the Applicant for the assisted living facility;

---

[3] The record before the Board is itemized in a list of fifty-five exhibits it considered which include correspondence, photographs, reports, drawings, and reports submitted by architects, engineers, and professional planners, and data derived from studies published by government agencies.

(3) The 2009 Verona Master Plan indicates that offices and residential uses should be limited to those locations other than street level in the [TC];

(4) The proposed assisted living facility will result in substantial impairment to the [TC] Zone due to the fact that the proposed assisted living facility will have residential units on the street level and does not include retail or otherwise permitted component uses in its design;

(5) The proposed assisted living facility will result in substantial detriment to the public good as a result of increased traffic on Claremont Avenue and the nearby residential streets from vehicles exiting both the . . . Bloomfield Avenue property and the . . . Claremont Avenue property;

(6) The proposed assisted living facility will result in substantial detriment to the public good due to safety concerns for pedestrians crossing Claremont Avenue from the overflow parking area at the . . . Claremont Avenue property to the assisted living facility as well as the need for large refuse collection and delivery trucks backing out of the service driveway onto Claremont Avenue;

(7) The proposed assisted living facility will result in substantial detriment to the public good as a result of increased traffic congestion on Bloomfield Avenue as a result of vehicles waiting to make left hand turn movements into the proposed Bloomfield Avenue driveway to access the . . . Bloomfield Avenue property;

(8) The proposed assisted living facility will result in substantial detriment to the public good as a result

20

[of] the potential for vehicular turning conflicts due to the proximity of the proposed Bloomfield Avenue driveway to access . . . Bloomfield Avenue and the driveway to Verona Place Apartments located across the street . . . and . . . Bloomfield Avenue in Verona.

IV.

On March 5, 2019, Kensington filed an action in lieu of prerogative writs in the Law Division claiming the Board's denial of its application to construct an assisted living facility in Verona's Town Center district was arbitrary, capricious, and unreasonable because it presented sufficient grounds to show the facility was an inherently beneficial use and satisfied all the applicable criteria of the Municipal Land Use Law (MLUL), N.J.S.A. 40-55D-1 to -163. Furthermore, for the first time in this case, Kensington named the Township of Verona as a defendant, alleging the municipality violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-2. Kensington claimed Verona:

> Defendant Township since 2015, has been involved in litigation involving changing Verona's ordinances to permit low and moderate income housing in the Township.
>
> Defendant Township was aware, prior to the start of the hearings on this Application that [p]laintiff's project would provide [thirteen] affordable beds for a protected class, those persons who need the assistance and services provided by assisted-living.
>
> . . . .

21

> Defendant Township, through the various actions at the hearings, or otherwise, failed to recognize the assistance [p]laintiff's project would provide to the Township in the low and moderate income housing litigation.

Based on these nebulous and unsupported allegations, Kensington petitioned the Law Division to award it monetary damages, counsel fees, and any other relief as may be just and equitable.

On October 7, 2019, Judge Thomas R. Vena held a hearing on the matter and rendered an oral opinion dismissing Kensington's complaint, followed by a written opinion. After summarizing the factual record, Judge Vena upheld the Board's denial of the zoning application. In this appeal, Kensington reiterates the arguments it raised before the Law Division. It claims the Board failed to properly consider the evidence presented and thereafter apply the four-factor Sica balancing test. Kensington maintains the Board's decision is predicated on "subjective, unsubstantiated personal opinions as to the putative negative impacts . . . ."

We start our analysis by reaffirming our standard of review. The decision of the Board to deny Kensington's use variance application based on its failure "to satisfy the negative criteria, like the review of decisions of local land use agencies generally, begins with the recognition that the board's decision

is presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable." Sica, 127 N.J. at 166-67.  The judiciary grants this presumption to local zoning boards because they "possess special knowledge of local conditions and must be accorded wide latitude in the exercise of their discretion." Id. at 167.

"Generally, to satisfy the positive criteria, an applicant must prove that 'the use promotes the general welfare because the proposed site is particularly suitable for the proposed use.'" Smart SMR v. Fair Lawn Bd. of Adjustment, 152 N.J. 309, 323 (1998) (quoting Medici v. BPR Co., 107 N.J. 1, 4 (1987)). Here, notwithstanding Kensington's protestation, it is undisputed that an assisted living facility is an inherently beneficial use.  Although this significantly reduces its burden of proof, Kensington still must prove its application will not result in substantial detriment to Verona's plans for the development of the Town Center and its zoning vision as reflected in its Master Plan.

The Legislature codified this zoning principle in 1997 when it amended N.J.S.A. 40:55D-70(d) to include the following provision:

> No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good

23

and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

[(Emphasis added).]

Verona's Master Plan envisions the TC Zone District to be a business area that would encourage the development of the following commercial activities:

No building or premises shall be erected, altered or used except for the uses designated . . . as follows:

(1) Retail stores and retail service establishments, including stores or shops or retail business conducted entirely within the confines of a building.

(2) Cafeterias, full-service restaurants, snack and nonalcoholic beverage bars, confectionery and nut stores, retail bakeries. These uses shall have a maximum seating capacity of 100 patrons. These uses shall be permitted on lots having frontage on Bloomfield Avenue.

(3) Banks and other financial institutions, but not including drive in uses.

(4) Theatrical and motion picture theaters.

(5) Family day care centers.

(6) Personal service establishments.

The demolition of a banquet hall to construct a ninety-two unit, three-story assisted living facility in the midst of this designated business center is irreconcilable with the type of vibrant, commercial activity envisioned by the

A-1010-19

Township's governing body when it adopted its Master Plan. The Board's resolution denying Kensington's application for a use variance and multiple bulk variances carefully and methodically reviewed the testimony of all the expert witnesses, as well as the applicant's representative, and concluded the laudable aspects of the project did not outweigh its profound irreconcilability with the Township's zoning plans.

The Board concluded the use variance, and other relief Kensington sought, cannot be granted without substantial detriment to the public good and without substantially impairing the intent and the purpose of the Master Plan and zoning ordinance. We discern no legal or factual basis to conclude this decision by the Board was arbitrary, capricious, and unreasonable. Finally, Kensington's belated, unsupported claims against the Township based on the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION